**UNITED STATES of America, Plaintiff–Appellee,**

v.

**KING FEATURES ENTERTAINMENT, INC., Defendant–Cross/Defendant,**

**and**

**Salzburg Enterprises of California, Inc.,**

**and**

**Milton J. Salzburg, Defendant–Cross/Claimant–Appellant.**

**KING FEATURES ENTERTAINMENT INC., Plaintiff–Counter Claim–Defendant,**

v.

**SALZBURG ENTERPRISES OF CALIFORNIA, INC., Milton J. Salzburg, et al., Defendants–Cross–Claimants/Appellants.**

**Nos. 87–5747, 87–5944.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1987.

Decided April 4, 1988.

Glen A. Smith, Los Angeles, Cal., for plaintiff-counter claim defendant.

Stephen D. Peterson, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Joseph F. Hart, Weinstein & Hart, Beverly Hills, Cal., for defendants-cross-claimants-appellants.

Before O'SCANNLAIN and LEAVY, Circuit Judges, and ORRICK,* District Judge.

LEAVY, Circuit Judge:

## FACTS

This case concerns the alleged copyright infringement of certain cartoon films entitled "Beatles," "Barney Googles," "Krazy Kat," "Popeye," "Flash Gordon," and "Cool McCool" (the cartoons). The appellee King Features Entertainment, Inc. (KFE) holds the copyright on the cartoons and the exclusive right to distribute them.

KFE and the appellants, Milton Salzburg and Salzburg Enterprises of California, Inc. (Salzburg), signed a letter agreement which granted Salzburg a one-year license to sell the cartoons. The pertinent parts of the letter agreement, dated May 4, 1983, are:

1. The half-hours [the cartoons] are for use by the U.S. Armed Forces, on military bases in the United States of America and its territories. It is our understanding that they will be shown free of charge and not on television or cable.
2. The license period is for one year, from July 1, 1983 through June 30, 1984. At the end of that time, prints must be returned to King Features Entertainment.

Salzburg committed to buy "212 half-hours of Various and Popeye, Total $90,612" with ten percent down and the balance on delivery. The parties agree that the May 4, 1983 letter was their final, binding agreement.

In 1981 and 1982, Salzburg had negotiated five separate contracts with the Armed Forces Radio and Television Service (AFRTS) to deliver the cartoons at issue for viewing on its closed-circuit television. The delivery dates were July through December of 1983. Each contract required Salzburg to grant to AFRTS:

[T]he right to electronically transfer the material to video tape and to distribute the tapes and/or transmit the material by satellite to authorized American Forces Television Outlets outside the contiguous United States for their non-commercial telecast of the program material.

AFRTS provides extensive worldwide television service to military bases, including ships at sea.

KFE learned of the negotiations between AFRTS and Salzburg when it attempted to sell films to AFRTS for television use. An AFRTS agent advised KFE that AFRTS was dealing with Salzburg, but repeatedly refused to confirm whether AFRTS and Salzburg had any contracts.

A sales manager for KFE, Steven Weiser, called Milton Salzburg in late May or early June 1983 to tell him that KFE's license agreement with Salzburg prohibited a sale of the cartoons to AFRTS. KFE interpreted the sentence "It is our understanding that [the cartoons] will be shown free of charge and not on television or cable" to limit their viewing to theatres and classrooms on the military bases specified by the agreement.

Salzburg told Weiser he did not agree with KFE's interpretation. He told Weiser he interpreted the agreement to allow AFRTS to show the cartoons because AFRTS is not commercial television, but rather a non-commercial, closed circuit outlet serving only the United States Armed Forces. Salzburg also told Weiser he interpreted the agreement to allow AFRTS to show the cartoons anywhere the United States flag flies, including foreign and domestic U.S. military bases and ships at sea.

Salzburg then informed Weiser that if KFE disagreed with Salzburg's interpretation, it should call off the deal and return his $10,000 deposit. Salzburg later informed another KFE representative, Chips Barrabee, that Salzburg was selling the cartoons to AFRTS and that Barrabee could cancel the deal if KFE disagreed with Salzburg's interpretation of the agreement. No one from KFE ever cancelled the deal, or returned Salzburg's $10,000 deposit.

---

* Honorable William H. Orrick, Jr., Senior United States District Judge, Northern District of California, sitting by designation.

However, KFE's vice-president reminded Salzburg of the agreement's geographic and use restrictions in a letter dated June 15, 1983.

In late June and early July of 1983, KFE delivered prints of the cartoon films to Salzburg and cashed his check for $80,612. In July 1983 Salzburg delivered the prints to AFRTS. In August 1983 KFE's attorneys reiterated KFE's interpretation of the agreement and demanded that Salzburg stop negotiating with AFRTS to sell the cartoons. In January 1984 KFE confirmed Salzburg had contracts with AFRTS for television use of the cartoons.

## PRIOR PROCEEDINGS

KFE filed a complaint against Salzburg for copyright infringement, unfair competition, fraud, trespass, interference with business relations, and breach of contract. It sought injunctive relief and damages. On behalf of AFRTS, the United States filed a complaint against Salzburg alleging payment by mistake, unjust enrichment, violation of the False Claims Act, 31 U.S.C. §§ 3729–31, fraud and conversion, and breach of contract. KFE was named a defendant for purposes of declaratory relief only.

Salzburg responded by filing a cross-claim against KFE for indemnity, breach of contract, and bad faith denial of contract. KFE then filed a counterclaim against Salzburg which restated the claims in its original complaint.

The United States moved for summary judgment on its breach of contract claim, asserting that Salzburg did not acquire the copyright license the AFRTS agreement required. The district court granted the motion, holding that Salzburg had no authority to convey to AFRTS the rights to televise the cartoons outside the contiguous United States.

KFE then filed a motion for partial summary judgment on its claim for copyright infringement, claiming the five Salzburg/AFRTS contracts exceeded the scope of its May 4, 1983 agreement with Salzburg. KFE maintained the five contracts violated its exclusive right to reproduce, distribute, and display the cartoon features under section 106 of the Copyright Act of 1976, 17 U.S.C. § 106. It requested actual damages under 17 U.S.C. § 504(b), claiming the proper measure of those damages was the $137,240 which AFRTS paid to Salzburg for the cartoons. The district court granted KFE's motion for partial summary judgment and awarded damages of $137,240.

The United States moved to dismiss the remaining claims in its action and for entry of final judgment. The district court dismissed the United States' claims, entered final judgment against Salzburg, and issued an order to show cause why Salzburg's cross-claims against KFE should not be dismissed.

KFE also moved to dismiss its remaining claims, its cross-complaint, and Salzburg's cross-claim against it. The district court dismissed all remaining claims and entered final judgment in KFE's favor.

Salzburg appeals all of the district court's orders.

## DISCUSSION

Salzburg contends two genuine issues of material fact preclude summary judgment. The first is the scope of his license under the May 4, 1983 agreement. The second is whether KFE's conduct in not cancelling the deal and cashing Salzburg's $80,612 check constitutes a waiver or estoppel against KFE. Salzburg also contends the court erroneously awarded KFE damages on its copyright infringement claim, and that Salzburg's pendent cross-claims should not have been dismissed.

We review a grant of summary judgment de novo. *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 764 (9th Cir. 1986). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986).

## 1. The Scope of the License

Salzburg contends the district court ignored facts in his declaration in opposition to KFE's motion for summary judgment when it determined the May 4, 1983 agreement was unambiguous and not amenable to Salzburg's interpretations. He insists the court ignored the legal standards for reviewing the evidence and for contract interpretation.

▪ Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning. *See International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir.1985). Interpretation of a contract is a matter of law, including whether the contract is ambiguous. *Beck Park Apts. v. United States Dept. of Housing*, 695 F.2d 366, 369 (9th Cir.1982).

Under California law, even if the written agreement of the parties is clear and unambiguous on its face, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir.1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Union Bank v. Winnebago Indus., Inc.*, 528 F.2d 95, 98 (9th Cir.1975). However, if after considering extrinsic evidence the court finds the language of the contract is not reasonably susceptible to the asserted interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract. *Brobeck*, 602 F.2d at 871.

Salzburg contends that the language "[the cartoons] will be shown free of charge and not on television or cable" is understood in the industry to mean the cartoons could not be shown on commercial broadcast or cable television. To bolster this interpretation, Salzburg presents extrinsic evidence, a letter Chips Barrabee wrote to him on April 19, 1983 which states: "as long as [the cartoons] are not for theatrical release, domestic, commercial, or public service television, or cable use, we would be delighted to give you license for sale."

▪ The May 4, 1983 agreement unambiguously states on its face that the cartoons may not be shown on television or cable. Under California law, however, we may consider whether the April 19, 1983 letter proves a meaning to which the language of the agreement is reasonably susceptible.

▪ Read as a whole, the letter appears to enforce the first paragraph of the contract, which limits use of the cartoons to the military. However, it is insufficient to prove the parties agreed to cartoon viewing on non-commercial, closed-circuit military television. The letter itself is ambiguous in that the word "commercial" appears not to modify "cable." The meaning of "domestic" is not apparent. "Closed-circuit" is not even mentioned; the parties' intentions here are unascertainable. Consequently, the May 4, 1983 agreement is not reasonably susceptible to Salzburg's interpretation that military, closed-circuit television was an acceptable method to view the cartoons. The letter may not be used to vary the unambiguous terms of the contract.

▪ Salzburg's declaration also states that the language "for use by the U.S. Armed Forces, on military bases in the United States of America and its territories" means that the cartoons could be shown anywhere the United States flag flies, including foreign and domestic U.S. military bases and ships at sea. The contract language is not susceptible to Salzburg's interpretation. His subjective belief that "territories" includes worldwide United States military bases must be rejected, since a court must look to objective criteria to ascertain the intent of parties to a contract. *Id.* at 873. Objectively, United States "territories," described in Title 48 of the United States Code, are commonly known to include Guam, the Virgin Islands, and American Samoa.

Salzburg's interpretations are implausible in this factual context. He fails to provide more persuasive evidence than would otherwise be necessary to show that

there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). His declaration does not raise an issue which "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). By licensing the cartoons to AFRTS for world-wide use, he exceeded the scope of the license KFE granted.

### 2. *Waiver or Estoppel*

Salzburg claims KFE knew he was going to license the cartoons to AFRTS and, despite his demand for a return of his deposit and his offer to "call off the deal," KFE accepted his final payment of $80,612 and delivered the cartoons. He claims there are questions of fact remaining as to whether KFE by its conduct acquiesced to his interpretation and should be estopped from challenging the AFRTS/Salzburg agreements.

■ Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it. *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir.1983). The evidence demonstrates KFE did not intentionally relinquish any of its known rights. Salzburg admits Weiser of KFE told him he was not allowed to make a sale to AFRTS. KFE's vice-president reminded Salzburg of the agreement's restrictions, which attorneys for KFE reiterated. An internal memorandum dated June 3, 1983, reflects KFE's interpretation of the agreement when it learned Salzburg was negotiating with AFRTS.[1] A handwritten note on a letter dated June 10, 1983, from Salzburg to KFE shows that KFE did not intend their cartoons to be sold for use on closed circuit cable television.[2] These facts demonstrate that there is no genuine issue remaining with respect to waiver.

Under the same facts, Salzburg asserts that KFE is estopped. Four elements are necessary to establish estoppel: 1) the party to be estopped must know the facts; 2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; 3) the latter must be ignorant of the true facts; and 4) he must rely on the former's conduct to his injury. *Bob's Big Boy Family Restaurants v. N.L.R.B.*, 625 F.2d 850, 854 (9th Cir.1980).

■ Salzburg has not shown that he has evidence to establish three of these elements. First, even if KFE knew Salzburg's interpretation of the agreement, there is no evidence to show KFE intended Salzburg to rely on its subsequent failure to rescind or return the down payment. KFE repeatedly reminded Salzburg of the scope of the agreement. Second, Salzburg cannot prove he was ignorant of KFE's interpretation of the agreement. He admits he knew it differed radically from his own. Finally, Salzburg cannot prove he relied on KFE's conduct to his detriment. The AFRTS/Salzburg contracts already bound Salzburg when he entered the agreement with KFE.

1. The memo states:
The following covers my conversations of June 1, 1983 with John Cosgrove–A.F.R.T.S. and Milton Salzburg.
*Salzburg*—He admitted he offered the series to A.F.R.T.S. but could not comment until he read the contract. I read him the paragraph covering territory. He began to go into semantics and his own interpretation of our contract. He claimed anywhere the U.S. Flag flies is a U.S. territory.
He advised he was going to pursue non-theatrical markets in the U.S. Army, Air Force and Naval Bases. He would also approach Health, Education and Welfare, U.S. Information Agency, Chaplain Corp. I advised him he did not have rights to A.F.R.T.S. He said he should be entitled to commission if we make the sale because he introduced the shows (What Chutzpah!), I said no way.
He asked if there was a problem. I advised not as long as we understand which territories he is involved in. He also asked if we wanted to send his check back. I advised I was going to talk with management for further information. I left him on good terms.

2. The note says: "Per Telecon w/Salzburg from Houston, Tex. Bill—Milt [Salzburg] interprets our letter to him as authorization to sell to AFRTS. I said no, this is closed circuit *TV cable*. He said he will sue if we do not deliver. Be prepared for another go-around—CB"

Because Salzburg fails to show the existence of a genuine issue of fact with respect to three elements necessary to prove estoppel, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### 3. *The Award of Damages to KFE*

■ Section 504(b) of the Copyright Act of 1976, 17 U.S.C. § 504(b), states that the holder of a copyright who prevails in an action for infringement "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Actual damages are defined as "the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement." *Frank Music Corp. v. Metro–Goldwyn–Mayor, Inc.*, 772 F.2d 505, 512 (9th Cir.1985), *citing* 3 M. Nimmer, *Nimmer on Copyright* § 14.02, at 14–16 (1985). The Ninth Circuit test for market value is "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." *Id.* (citing *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir.1977)).

The district court found KFE sustained actual damages in 1983 because the Salzburg/AFRTS agreement precluded KFE from a viable market. It concluded that the price of the AFRTS contracts, $137,240, was prima facie evidence of what a willing buyer would have been reasonably required to pay a willing seller for the cartoons. However, the district court failed to analyze the true extent to which the market value of the cartoons was destroyed or injured by Salzburg's action. While the court correctly decided that two separate markets for military bases were involved—non-television in the United States and its territories, and television outside the United States and its territories—no evidence indicates the length of time the latter market, which Salzburg exploited, was available. Assuming Salzburg precluded KFE from this market in 1983, nothing shows KFE was precluded from

later sales, particularly since the cartoons were never seen on television on overseas bases. Therefore, a material issue of fact remains regarding actual damages. The award of $137,240 is reversed, and the issue is remanded for a determination of KFE's actual damages, if any, from the copyright infringement.

### 4. *Dismissal of Salzburg's Pendant Cross–Claims*

In response to the United States' action against him, Salzburg filed a cross-claim against KFE for damages and declaratory relief. Salzburg claimed he was entitled to indemnity from KFE, because he had acted with KFE's consent and approval; KFE allowed him to sell the cartoons to AFRTS; and KFE breached the May 3, 1983 agreement by advising AFRTS that Salzburg did not have the right to sell cartoons to AFRTS. Salzburg also claimed KFE denied the May 3, 1983 agreement in bad faith by acting willfully, maliciously, and with conscious disregard of Salzburg's contract rights. He requested punitive damages for this denial. After ruling in favor of KFE and the United States and after a hearing to show cause why these cross-claims should not be dismissed, the district court dismissed them without prejudice.

The district court did not abuse its discretion in dismissing the cross-claims. They are mooted by the decision that Salzburg exceeded the scope of the license he acquired and thereby infringed KFE's copyright. Further, this circuit has held that once a motion for summary judgment is granted on copyright claims, pendant state claims may be dismissed. *Jason v. Fonda*, 698 F.2d 966 (9th Cir.1982).

### CONCLUSION

No genuine issues of material fact remain in this case of copyright infringement with respect to the scope of the Salzburg license. Summary judgment was properly granted to both KFE and the United States. The May 4, 1983 agreement between Salzburg and KFE is clear and unambiguous. No extrinsic evidence proves a

meaning to which its language is reasonably susceptible. There is no estoppel against KFE because there is no evidence that KFE waived its rights.

However, the award of $137,240 to KFE is reversed and remanded for a determination of actual damages. There is no proof KFE could not have sold its cartoons to AFRTS after 1983, thereby reducing its damages.

The Salzburg cross-claim was properly dismissed after summary judgment was granted to KFE on its claim of copyright infringement. The district court already had determined all issues present in the cross-claim, rendering it moot.

With the exception of damages, all orders of the district court are AFFIRMED.