**Ronald L. RENNICK; Richard S. Rennick; Vantec Ventures Corporation; HHC–Home Health Care, Inc., Home I.V. Therapy of Southern Oregon, Inc; Home Infusion Care of Eugene, Inc. d/b/a O.P.T.I.O.N. Care of Eugene, Plaintiffs–Appellants,**

v.

**O.P.T.I.O.N. CARE, INC., Defendant–Appellee.**

No. 93–17105.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 11, 1995.

Decided Feb. 22, 1996.

Dale A. Cooter, Cooter, Mangold, Tompert & Chapman, P.C., Washington, DC, for plaintiffs-appellants.

David J. Butler (on the briefs), and Barry M. Heller (argued), Brownstein, Zeidman & Lore, A Professional Corporation, Washington, DC, for defendant-appellee.

Before: GOODWIN, POOLE and KLEINFELD, Circuit Judges.

Opinion by Judge KLEINFELD.

KLEINFELD, Circuit Judge:

We affirm a summary judgment. We conclude that the parties had not entered into a contract. The claims to the contrary rely on a handshake and a letter of intent. Though in appropriate circumstances, either or both could manifest agreement, here the express provisions of the letter of intent establish that, as a matter of law, no contract was made.

## I. Facts.

O.P.T.I.O.N. Care, Inc., a California corporation, franchises home intravenous therapy services. These services include chemotherapy, nutrient infusions for patients unable to eat, and pain management infusions such as intravenous morphine.

The Rennicks, a physician in Oregon and an attorney in Canada, sought to become O.P.T.I.O.N.'s sole Canadian franchisee. Vantec, Inc., a Canadian firm, proposed to invest money in the project. Vantec had people with the experience and contacts to negotiate effectively with the Canadian government. Beginning in September of 1986, the Rennicks and Vantec negotiated with O.P.T.I.O.N. toward an exclusive Canadian franchise.

The Rennicks and Vantec argue that an agreement was reached at a meeting of the principals in British Columbia on July 3,

1990. Before the meeting, the Rennicks circulated a five page single spaced written agenda. They proposed discussing numerous matters of capitalization and relations among the existing and planned corporations, as well as the business plan for the contemplated Canadian franchise. The agenda expressly provided that the terms of an agreement would be formulated "for Board approval of all parties:"

PURPOSES:

—To discuss proposed reverse takeover of [Vantec] by HHC and proposed equity participation by [O.P.T.I.O.N.].

—To formulate terms of a proposed initial agreement to this end *for Board approval of all parties.*

—To formulate proposed general development business plan for specific time periods.

(emphasis added.)

This provision in the Rennicks' agenda for approval by the respective boards of directors was consistent with the restriction O.P.T.I.O.N. had put on its president at its board meeting just before the July 3 meeting. He was expressly not authorized to commit the corporation without subsequent board of directors approval:

Discussion continued and the Board was assured that any transaction concerning Canada would come back to the Board for approval. Hoggard [O.P.T.I.O.N.'s president], in essence, is getting authority to move forward but must have final Board approval before making any commitments.

One of the Vantec negotiators testified that at the end of the meeting, everyone ceremoniously shook hands:

At the end of the meeting I volunteered that the way we had formalized relationships before getting lawyers involved was to sort of do it on a handshake basis, and that we wanted to feel that the people we were dealing with were as good as their word. And we usually formalized that by a handshake on the deal. So I proposed that, having spent these previous months and these three or four hours bringing into the best form we could our understandings, that we formalize the deal by a hand-

shake. And my recollection is that Mitch enthusiastically agreed to that and all the principal parties got up and circulated around the room and shook hands with each other on having made the deal.

Oddly, no other deposition testimony is cited regarding this handshaking. On summary judgment we assume for purposes of determining whether the movant was entitled to judgment as a matter of law, that the facts were as contrary to the movant's position as the cognizable evidence would establish if believed. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). Thus we assume that the parties shook hands "before getting lawyers involved" in order to give some formality to their understandings.

At the end of the July 3 meeting, some sort of documentation was to be prepared, though the parties have differing recollections on precisely what it was to be. A Vantec person thought that "the documentation necessary to implement the agreement would—the parties would work on it as quickly as possible and try to have a closing by the end of July 1990." Rick Rennick testified that the Vantec person who testified to the handshake said that Mr. Rennick and one of the O.P.T.I.O.N. people should "put together something that Vantec could base a public announcement on," so Mr. Rennick did a first draft of a letter of intent. One of the O.P.T.I.O.N. people testified that the remark was made at the end of the meeting, "we understand you're going to send us a draft of the letter of intent. We'll work it over, we'll get back to you, and we'll try to do it in timely fashion." No one contradicted this. There is no genuine issue of fact as to the proposition that some document was contemplated, and that the Rennicks were to prepare and circulate a first draft to be reviewed by the other parties.

Rick Rennick circulated a draft letter of intent on July 6. The draft provided that final documentation required the approval of the boards of directors of all three entities. After reviewing the July 6 draft, an O.P.T.I.O.N. vice-president requested additional language, providing for an "interim agreement" which would be subject to approval by the parties' boards of directors.

Language to this effect was included in a July 17 draft.

After receiving the July 17 draft, O.P.T.I.O.N.'s president added language making it clear that O.P.T.I.O.N. did not intend to enter into a contract at the July 3 meeting: "respective intentions ... expressed during a meeting ... directed toward the creation of a binding interim agreement and other contracts" and "intent to continue good faith discussions directed toward the creation of formal written contracts." O.P.T.I.O.N. also added language indicating that O.P.T.I.O.N. did not, by signing the letter of intent, mean to make a contract: "with the understanding that this letter of intent is of no binding effect on any party hereto." O.P.T.I.O.N.'s president signed the letter of intent so modified, and sent it to Rick Rennick with a July 20 cover letter advising that language had been added "to clarify the intent of O.P.T.I.O.N., Inc. in signing this document."

As signed by all parties effective July 20, the letter of intent said that the July 3 meeting was "directed toward" making an agreement, and that the parties intended to negotiate toward creation of written contracts subject to approval by the parties' boards of directors:

> The purpose of this letter is to acknowledge the respective intentions of HHC, VVC [Vantec] and OCI [O.P.T.I.O.N.], expressed during a meeting held in Richmond, B.C., on July 3, 1990, and directed toward the creation of a binding interim agreement and other contracts designed to implement various proposed relationships among the parties.

> .    .    .    .    .

> ... [T]he signatories to this letter confirm their intent to continue good faith discussions directed toward the creation of formal written contracts that, upon approval by the board of Directors of each party, will be executed to establish the following arrangements, and to do such other things as may be required in connection therewith.

> .    .    .    .    .

... Immediately upon receipt of your acceptance of the terms hereof, we will proceed to make arrangements with counsel for each of the parties for the completion of the Interim Agreement aforesaid and the completion of the final formal documentation, with the understanding that this letter of intent is of no binding effect on any party hereto.

The letter of intent also provided that following the execution of the letter of intent and before the formal contracts on the individual transactions, "the parties shall firstly execute and deliver an Interim Agreement (pre-transaction agreement) specifying the nature of the transactions required to establish the relationships set out in paragraphs 1 through 10" approval of which "shall be subject to Board of Directors approval of each party and completion of satisfactory review of financial and other information. . . ."

No interim or final agreement was ever signed. The O.P.T.I.O.N. board never approved any transactions referred to in the letter of intent. The deal fell apart. Basically, a new person took over control of O.P.T.I.O.N. and chose not to proceed. Meanwhile, Vantec took over the Rennicks' company, the Rennicks and their business consultant took a majority interest in Vantec, and Vantec issued a press release announcing its expectation of a deal. The Rennicks' theory of the case is that a deal was made at the July 3 meeting, and the new owner of O.P.T.I.O.N. reneged. O.P.T.I.O.N.'s theory is that they never made a deal. We conclude, after *de novo* review of the record, that O.P.T.I.O.N. was correct as a matter of law, so summary judgment in its favor was appropriate.

## II. Analysis.

The district court's grant of summary judgment is reviewed *de novo*. *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). The district court granted O.P.T.I.O.N.'s motion for summary judgment based upon the grounds that the alleged agreement between appellants and O.P.T.I.O.N. failed to satisfy the statute of frauds. On appeal, we may affirm on any ground supported by the record. *First Pa-*

*cific Bank v. Gilleran*, 40 F.3d 1023, 1024 (9th Cir.1994). We affirm on the ground that no contract was made, and do not reach the question whether, if a contract was made, enforcement would be contrary to the statute of frauds.

An initial question is what law applies. It might be arguable whether we should apply the law of one or another of the provinces of Canada, because the July 3 meeting was in British Columbia, Vantec was an Alberta company, and performance would be in Canada; California law, because O.P.T.I.O.N. did business in California; or Oregon law, because the Rennicks did business in Oregon. A district court sitting in diversity generally must apply the choice of law rules for the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Under California conflict of law rules, the parties may agree to what law controls, unless the choice is contrary to a fundamental interest of a state with a materially greater interest. *See Thomas v. Wentworth Hotel Co.*, 158 Cal. 275, 110 P. 942 (1910); Restatement (Second) Conflict of Laws § 187 (1971 & Supp.1988). There was no contractual provision governing choice of law, there being no contract, and the letter of intent said nothing about this detail. The parties have briefed the case, on both sides, on the assumption that California law applies, and they so stipulated at oral argument. We accordingly apply California law.

### A. The July 3 handshake.

The Rennicks argue that the July 3 meeting resulted in a binding oral contract. O.P.T.I.O.N., however, claims that the parties did not intend to be bound until obtaining board approval and formal documentation. The Rennicks argue that the formal handshake was evidence from which a jury could infer that an agreement was made July 3, and that the letter of intent was a mere memorialization of a contract already made.

■ A manifestation of assent sufficient to conclude a contract is not prevented from doing so because the parties manifest an intention to memorialize their already made agreement in writing. Restatement (Second)

of Contracts § 27 (1981); *Columbia Pictures Corp. v. De Toth*, 87 Cal.App.2d 620, 197 P.2d 580, 585 (1948). But if a party knows that the other intends no obligation to exist until the written agreement is made, the earlier manifestation does not constitute a contract. Restatement (Second) of Contracts § 27 comment b; *Columbia Pictures Corp.*, 197 P.2d at 585–86. Whether the parties intended their oral agreement to be immediately effective or only to become binding on the execution of the writing depends on the circumstances. *McKeon v. Giusto*, 44 Cal.2d 152, 280 P.2d 782, 785 (1955).

■ We assume that the handshakes really took place as one witness claimed. Handshakes are significant. When people shake hands, it means something, but several meanings are possible. "As a greeting, sign of friendship or goodwill, confirmation of a promise, bargain, etc.; (of combatants) as a sign of the absence of ill-feeling." Compact Oxford English Dictionary 1731 (2d ed. 1991). If there were nothing more than the testimony about the meeting and the handshake, a jury might reasonably infer either that the handshake was confirmation of a contract, or that it was an expression of friendship and the absence of ill will after a day of hard bargaining.

But there was something more, the agenda and the letter of intent. The agenda assured the parties that the July 3 meeting would not bind them, and would merely develop a "proposed" agreement "for Board approval of all parties." The letter of intent said, in effect, "this is what we did at our meeting—we agreed to negotiate further, and agreed that we had no contract unless and until we put it in writing and our boards of directors approved it."

The letter of intent expressly "is to acknowledge the respective intentions ... during a meeting held in Richmond, B.C., on July 3, 1990, and directed toward the creation of a binding interim agreement and other contracts." The parties "confirm their intent to continue good faith discussions directed toward the creation of formal written contracts that, upon approval by the board of Director of each party, will be executed to establish the following arrangements." The

letter then goes on to say that it too does not bind the parties to the Canadian venture contemplated, and there will be no contract until the parties' boards of directors approve a written contract. It says "this letter of intent is of no binding effect on any party hereto," in the context of postponing any binding contract until then. They speak plainly of their intention to work toward a deal to be put in writing, approved, and signed subsequently.

There is sometimes an implication in shaking hands that honor is pledged. That implication cannot create a contract here, though, because the parties expressly agreed that they did not yet have a contract. There is no dishonor in refusing to be bound by a contract to which a party expressly said it was not yet prepared to agree. The handshake "before getting lawyers involved" and before letting O.P.T.I.O.N.'s board decide whether to approve the deal would, if used to bind O.P.T.I.O.N., subvert the express intentions of the parties. A handshake cannot bind another to a contract, when the promissee knows that the prospective promissor has neither the intention nor the authority to make a binding promise. By custom, it is a rude insult to reject an outstretched hand in most circumstances, and to do so at the end of a long business meeting would likely prevent a future deal. The agenda circulated before the meeting, and the letter of intent signed afterward, said the meeting was for discussion, and that no party would be bound thereby.

## B. The letter of intent.

Appellants argue that, if the oral agreement they claim was made July 3 failed to satisfy the statute of frauds by itself, then the letter of intent should be taken as a sufficient written and signed memorandum. We do not reach the question whether the letter would satisfy the statute of frauds, because we conclude that as a matter of law, neither the July 3 oral understandings, nor the memorialization of those understandings in the letter of intent, amounted to a contract. The reason is that the parties intended not to be bound.

"Letter of intent" is not a legal term of art. The term is seen in real estate development documents, securities underwriting, and sales of corporate assets, among other areas. Generally, "letter of intent" refers to a writing documenting the preliminary understandings of parties who intend in the future to enter into a contract. *See A/S Apothekernes Laboratorium v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155, 158 (7th Cir. 1989); Black's Law Dictionary at 814 (5th ed. 1979). "[T]he purpose and function of a preliminary letter of intent is not to bind the parties to their ultimate contractual objective. Instead, it is only 'to provide the initial framework from which the parties might later negotiate a final ... agreement, if the deal works out.'" *A/S Apothekernes Laboratorium*, 873 F.2d at 158. As these authorities imply, calling a document "letter of intent" implies, unless circumstances suggest otherwise, that the parties intended it to be a nonbinding expression in contemplation of a future contract, as opposed to its being a binding contract.

Commonly a letter of intent is used so that people negotiating toward an agreement, who do not yet have one, can get their preliminary inclinations down on paper without committing themselves. This avoids a misunderstanding that a commitment has been made. It also has value in preserving a common understanding of what has been talked about in earlier negotiations, before spending the time and money on later negotiations, and justifies further expenditures on attorneys and others. It may be used to stimulate negotiations with third parties, as where a shopping center developer shows a prospective lender a letter of intent from a potential anchor tenant, to induce the prospective lender to commence negotiations.

All these purposes are defeated if what was meant to be a nonbinding letter of intent is allowed to form the basis for a damages award. Letting a nonbinding letter of intent go to a jury as a possible basis for compensatory and perhaps punitive damages makes it too risky to sign one, so negotiators are deprived of this useful intermediate device between vague feelers and a binding contract. This is not to say that a letter of intent cannot be a contract. Regardless of the title, if the content shows that the parties intended to be bound, and the other requisites of a contract have been satisfied, it may be a contract. We have to study the words and context to decide.

It is a basic tenet of contract law that creation of a valid contract requires mutual assent. *Kruse v. Bank of America*, 202 Cal. App.3d 38, 248 Cal.Rptr. 217, 229 (1988); John D. Calamari and Joseph M. Perillo, The Law of Contracts §§ 11–12 (1970). "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26 (1981). Parties must communicate their mutual consent to enter into a contract. Cal.Civ.Code §§ 1550, 1565 (1982 & Supp.1995).

If there "is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done." *Smissaert v. Chiodo*, 163 Cal.App.2d 827, 330 P.2d 98, 100 (1958); *see also Forgeron Inc. v. Hansen*, 149 Cal.App.2d 352, 308 P.2d 406, 411 (1957). An agreement to make an agreement, without more, is not a binding contract. *Autry v. Republic Productions*, 30 Cal.2d 144, 180 P.2d 888, 893 (1947). "Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole." *Smissaert*, 330 P.2d at 100. *See also Beck v. American Health Group Intern.*, 211 Cal. App.3d 1555, 260 Cal.Rptr. 237, 241 (1989). "Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement." *Kruse v. Bank of America*, 248 Cal.Rptr. at 229.

The letter of intent signed by the Rennicks, Vantec, and O.P.T.I.O.N. provided by its content as well as its title that it was not intended to bind the parties to the contemplated Canadian venture. It said that

"this letter of intent is of no binding effect," and that the parties were negotiating toward an interim agreement not yet made, and that such an agreement would be a subsequent written document subject to approval by the parties' boards of directors:

> The *purpose of this letter is to acknowledge the respective intentions* of HHC, VVC [Vantec] and OCI [O.P.T.I.O.N.], expressed during a meeting held in Richmond, B.C., on July 3, 1990, and *directed toward the creation of a binding interim agreement and other contracts* designed to implement various proposed relationships among the parties.
>
> .    .    .    .    .
>
> ... [T]he signatories to this letter confirm their *intent to continue good faith discussions directed toward the creation of formal written contracts that, upon approval by the board of Directors of each party,* will be executed to establish the following arrangements, and to do such other things as may be required in connection therewith.
>
> .    .    .    .    .
>
> ... Immediately upon receipt of your *acceptance of the terms* hereof, we will proceed to make arrangements with counsel for each of the parties for the completion of the Interim Agreement aforesaid and the completion of the final formal documentation, *with the understanding that this letter of intent is of no binding effect on any party hereto.*

(emphasis added).

The Rennicks argue that such language in the letter of intent as "OCI shall grant to HHC/VVC ...," and "OCI shall provide ...," shows that mandatory obligations were meant to be imposed. One must wonder how such an argument can be made with a straight face, in light of language, required by O.P.T.I.O.N. before it would sign, saying "this letter of intent is of no binding effect on any party hereto." In that context, "[O.P.T.I.O.N.] shall grant," and so forth, meant "if we ultimately enter into a binding contract, then it is our present intention that O.P.T.I.O.N. shall grant...."

Where a letter says that it is subject to the terms of a contemplated mutual agreement to be written and signed in the future, but other evidence indicates that the parties decided to be bound by the terms of the letter, the letter may amount to a contract. *Seaman's Direct Buying Serv. v. Standard Oil,* 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984), *overruled in part by Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995), and *disapproved of by Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995). But the rights of private parties to enter into contracts also embraces their rights not to, and there is no contract where the objective manifestations of intent demonstrate that the parties chose not to bind themselves until a subsequent agreement is made. *Beck,* 260 Cal.Rptr. at 242.

The letter of intent in the case at bar shows that the parties intended not to be bound to the Canadian venture unless and until a subsequent agreement was made and was approved by their boards of directors. The one proposition to which they expressed their intention to agree was that they had not as yet agreed to the Canadian venture.

C.    Unreasonable reliance.

■ Plaintiffs argue that the claimed promises of O.P.T.I.O.N. should be enforced under the doctrines of part performance and promissory estoppel. These doctrines appear to be treated as one under California law. John D. Calamari & Joseph M. Perillo, The Law of Contracts § 327 at 499. In order to constitute part performance the acts (1) must be "unequivocally referable" to the terms of the oral contract, *American Cas. Co. v. Curran Productions, Inc.,* 212 Cal. App.2d 386, 28 Cal.Rptr. 131, 135 (1963); (2) must irretrievably change plaintiffs' position, and (3) must be performed in reasonable reliance on the contract. *See Monarco v. Lo Greco,* 35 Cal.2d 621, 220 P.2d 737 (1950).

The Rennicks and Vantec claim that they relied on O.P.T.I.O.N.'s commitment to the Canadian venture in several ways. The reliance included a change in corporate structures and ownership, so that Vantec took

over the Rennicks' company, and then the Rennicks and their business consultant took a majority interest in Vantec. Vantec also issued a press release about the contemplated venture; its stock was publicly traded on the Alberta stock exchange.

■ If a party refuses to be bound, yet the other changes its position in reliance on the expectation that a contract will be made, reliance on the expectation cannot turn the non-promise into a contract. *See Phillippe v. Shapell Industries, Inc.*, 43 Cal.3d 1247, 241 Cal.Rptr. 22, 743 P.2d 1279 (1987) (holding that broker's reliance on a promise which he knew to be unenforceable was unreasonable, and he therefore suffered no unconscionable injury). The reason is that reliance must be reasonable to set up an estoppel. In light of the unequivocal nonbinding language in the letter of intent, reliance on the existence of a contract was unreasonable as a matter of law. The July 3 meeting and the letter of intent might have made the Rennicks' and Vantec's actions prudent as a matter of business judgment, in contemplation of a probable contract, but they could not control whether the reliance would be reasonable for purposes of binding O.P.T.I.O.N. to a contract to which it expressly had as yet refused to agree. *See Bank of the West v. Valley Nat. Bank of Arizona*, 41 F.3d 471, 478 (9th Cir.1994).

D. Other theories.

The Rennicks claim that O.P.T.I.O.N. violated California Franchise Investment Law. *See* Cal.Corp.Code §§ 31300, 31301. That statute protects a person who "shall have purchased a franchise," *id.*, and they did not, with respect to the Canadian venture, so this claim was properly dismissed. *See Dameshghi v. Texaco Refining & Marketing Inc.*, 3 Cal.App.4th 1262, 6 Cal.Rptr.2d 515, 527 (1992) (offeror seeking to purchase franchise from franchisee has no standing to sue franchiser under state franchise law, as he was not a "franchisee"), *overruled on other grounds by Trope v. Katz*, 11 Cal.4th 274, 45 Cal.Rptr.2d 241, 902 P.2d 259 (1995). Appellants cite *Ciampi v. Red Carpet Corp.*, 213 Cal.Rptr. 388 (Ct.App.1985), *reh'g granted*, but *Ciampi* may not be cited because rehearing was granted and the opinion on rehearing was not published. Cal.Rules of Court 976, 977.

■ The Rennicks claim breach of the covenant of good faith and fair dealing. That is a covenant implied in a contract. *Careau & Co. v. Security Pacific Business Credit*, 222 Cal.App.3d 1371, 272 Cal.Rptr. 387, 399 (1990). "[T]he validity of [the covenant of good faith and fair dealing cause of action] is dependent upon the formation of a contractual relationship." *Beck v. American Health Group International, Inc.*, 211 Cal.App.3d 1555, 260 Cal.Rptr. 237, 242 (1989) (citing *Kruse v. Bank of America*, 202 Cal.App.3d 38, 248 Cal.Rptr. 217 (1988)). *See also Hess v. Transamerica Occidental Life Ins. Co.*, 190 Cal.App.3d 941, 235 Cal.Rptr. 715 (1987). There was no contract, so the claim of breach of the covenant of good faith and fair dealing was properly dismissed.

■ The Rennicks also claim breach of O.P.T.I.O.N.'s fiduciary duty to them as a joint venturer. "Whether a joint venture exists depends on the intention of the parties." *April Enterprises, Inc. v. KTTV and Metromedia, Inc.*, 147 Cal.App.3d 805, 195 Cal.Rptr. 421, 427 (1983). O.P.T.I.O.N. had not yet agreed to engage in a joint venture or any other kind of continuing relationship with the Rennicks and Vantec. *See Pacific Hills Corp. v. Duggan*, 199 Cal.App.2d 806, 19 Cal.Rptr. 291 (1962) (an agreement to negotiate joint venture agreement is not binding). Business negotiation does not create a fiduciary relationship.

### III. Conclusion.

There was no contract between the parties because the letter of intent clearly indicated that no contract yet existed. Summary judgment is appropriate "when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning." *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 398 (9th Cir.1988). In the case at bar, the uncontradicted facts are that the parties went to a meeting intending not to be bound until they prepared a written agreement to be approved by their boards of directors. They agreed after the meeting

318

that they had not bound themselves at the meeting, and would not without approval of a written agreement by their boards of directors. Where the evidence shows that as a matter of law, a contract claim cannot prevail, summary judgment is an important device to prevent litigation from operating as a tool to extract an unjust settlement. It was appropriate here.

AFFIRMED.