214 F.3d 1030 (9th Cir. 2000)
 CABLE & COMPUTER TECHNOLOGY INC., a corporation,Plaintiff-Appellant,
v.
LOCKHEED SANDERS, INC., a Lockheed Martin Co., a corporation d/b/a Sanders; OPINION LOCKHEED MARTIN CORPORATION, a corporation; LOCKHEED MARTIN FEDERAL SYSTEMS, a corporation,Defendants-Appellees.
 No. 99-55004
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted April 4, 2000--Pasadena, California
Filed May 31, 2000
 
 [Copyrighted Material Omitted]
 Eric C. Liebeler, Catherine C. Hwang, Kirkland & Ellis, Los Angeles, California, for the plaintiff-appellant.
 John B. Quinn, Quinn, Emanuel Urquhart & Oliver, Los Angeles, California, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California. D.C. No.CV-97-05315-CM
 Before: William C. Canby, Jr., John T. Noonan, and William A. Fletcher, Circuit Judges.
 Opinion by Judge Noonan; Dissent by Judge Canby
 NOONAN, Circuit Judge:
 
 
 1
 Cable & Computer Technology, Inc. (CCT) appeals the judgment of the district court in its action for breach of contract and related wrongs against Lockheed Sanders, Inc. (Sanders) and other Lockheed entities (collectively Lockheed or the defendants). We affirm the grant of summary judgment against CCT on its Unfair Business Practice and Cartwright Act claims. On CCT's other appealed claims, we hold that material issues of fact were in dispute, reverse the district court and remand for trial. In some respects a garden variety contracts dispute, this case is set particularly in the world of defense contracting and draws a clear distinction between mere agreements to agree and agreements to team together to bid a subcontract, so that we think it may be helpful to publish our opinion.
 
 BACKGROUND
 
 2
 In 1996 Boeing Defense and Space Group (Boeing) was awarded a contract by the United States Air Force to upgrade the computer system for the B-1B bomber. Boeing needed subcontractors to perform the contract and in May 1996 issued a Request for Information or RFI to, among others, CCT. CCT is a 30-employee California corporation that designs, manufactures, integrates and tests equipment and systems intended to replace existing commercial and military computers. The purpose of the RFI was to alert CCT to Boeing's needs and to "prequalify" CCT as a bidder for a subcontract from Boeing. CCT had to respond to the RFI in June 1996 and to file its actual bid by November 11, 1996.
 
 
 3
 CCT had teamed with Sanders in 1993 in the upgrading of the computer system of the B-52 bomber and in 1994 to produce Futurebus Processor modules for the Lockheed F-22 Simulator. After receiving the RFI, CCT contacted Sanders, a division of Lockheed, to work with it on a bid on the Boeing project. What then happened is disputed. The parties' differing accounts will be set out below. Suffice it to say here that on October 30, 1996 Sanders withdrew, and, as a consequence, CCT was unable to make a bid for the Boeing subcontract. Boeing ultimately awarded this subcontract to Owego, a wholly owned subsidiary of Lockheed.
 
 PROCEEDINGS
 
 4
 On June 19, 1997, CCT filed this action in Orange County Superior Court. Lockheed removed it to the district court on the grounds of diversity. On March 23, 1998, Lockheed moved for summary judgment on CCT's first claim, which alleged breach of contract. The motion was granted on April 13, 1998. Thereafter, at later times whose dates will be noted as relevant, the district court entered summary judgment against CCT on each of its causes of action.
 
 
 5
 CCT timely appealed to this court.
 
 ANALYSIS
 
 6
 We will address the propriety of each of the summary judgments in turn, asking the standard questions whether there were material facts in dispute and whether the plaintiff offered some "significant probative evidence tending to support the complaint." Summers v. A. Teichert & Son, Inc. 127 F.3d 1150, 1152 (9th Cir. 1997). We may not, any more than the district court might not, weigh the evidence or determine the truth of the matter. We view the evidence in the light most favorable to the nonmoving party and take account of all inferences in its favor that may be drawn from the facts. In this diversity action we apply the substantive law of California.
 
 
 7
 Breach of Contract. Sanders says that no contract existed, that all the parties did was to try, unsuccessfully, to work out a "teaming agreement," which Boeing required to be submitted as part of the bid in writing if the bidder was to work with its own subcontractor. CCT says that it had a teaming agreement with Sanders in May 1996. The principal evidence offered by Lockheed is as follows:
 
 
 8
 1. In the deposition testimony of Michael Starzyk, the project manager for CCT, he repeatedly admitted that he expected there would be a signed, written teaming agreement.
 
 
 9
 2. Starzyk admitted that a written teaming agreement was required by Boeing to be submitted as part of the bid to Boeing.
 
 
 10
 3. In Sanders' Management Directive and Practice 10.10, effective October 25, 1996, various officers' approval of "a written Teaming Agreement" is required.
 
 
 11
 4. The three previous teaming agreements between CCT and Sanders on other projects were in writing.
 
 
 12
 5. The Boeing subcontract was worth about $20 million. The division of work between CCT and Sanders on such a large contract required negotiation before a contract could be reached.
 
 
 13
 6. Starzyk presented the first written draft of the teaming agreement in September 1996. The parties then negotiated 14 separate terms not addressed before that date.
 
 
 14
 7. CCT in its complaint admitted that as late as October 24, 1996 the parties had not "finalized" the teaming agreement.
 
 
 15
 8. The written drafts of the teaming agreement did not state that it was a memorial of an oral contract. The drafts declared that the agreement was "effective upon the date of its execution."
 
 
 16
 9. The drafts state that the agreement "contains the entire agreement of the parties and cancels and supersedes any previous understanding or agreement related to this Program, whether written or oral."
 
 
 17
 10. No agreement was ever reached on what CCT would pay Sanders for its computers and services.
 
 
 18
 11. No written agreement was ever executed.
 
 
 19
 CCT did not dispute these facts. It offered other facts to show that a contract existed between it and Sanders:
 
 
 20
 1. The August 7, 1997 deposition of Clark Hollingsworth, president of CCT, stated that in May 1996 he discussed the teaming of CCT and Sanders with Ehtisham Siddiqui, a vicepresident of Sanders, and that at the conclusion of the discussion, Siddiqui said, "We've got a deal."
 
 
 21
 2. In his January 7, 1998 deposition, Michael Starzyk stated that CCT and Sanders had an oral agreement "in place" in May 1996 "to go acquire and win the B1-B business."
 
 
 22
 3. In his August 1996 deposition, George Woodruff, Manager of Business Development or the marketing man for Sanders, stated that CCT and Sanders responded in writing in June 1996 to Boeing's RFI: "CCT is teamed with Sanders, a Lockheed Martin company, and we are both dedicated to obtaining the B-1B computer upgrade award"; that to the best of Woodruff's knowledge this statement was true; and that from June to October 1996, CCT and Sanders "acted like teammates" and made statements to each other and to others "that they were teammates."
 
 
 23
 4. CCT, joined by Sanders personnel, hosted Boeing's inspection of CCT's facilities in June 1996 as a prelude to submitting the bid to Boeing.
 
 
 24
 Sanders does not dispute these facts.
 
 
 25
 In sum, the district court had before it, when it granted Sanders' first summary judgment motion in April 1998, facts that were largely undisputed but might be argued in different ways. It was undisputed that the teaming agreement required by Boeing for the bid had to be in writing; both parties expected to have a written agreement, effective on execution; and no such written agreement was in existence. Applying hornbook law, the district court ruled that when parties intend to be bound only by a written agreement, their oral exchanges of assent do not bind them. See Rennick v. O.P.T.I.O.N Care, Inc., 77 F.3d 309, 315 (9th Cir. 1996).
 
 
 26
 Unexceptionable as the district court's statement of the law is, it avoids the question of whether there was an oral contract to produce the teaming agreement to be submitted as part of the bid to Boeing. Hollingsworth's and Woodruff's depositions supported the existence of such an oral contract.
 
 
 27
 On this appeal, Sanders argues that CCT did not sue on the oral agreement to work together but on the teaming agreement to be submitted to Boeing. CCT replies that here an agreement to work together to create a mutually acceptable bid and "a teaming agreement" are "the same"; that a distinction between them is "a false dichotomy" or "a phantom."
 
 
 28
 A teaming agreement is not a phrase with a fixed meaning. The federal government defines a "contractor team arrangement" as an arrangement between "a potential prime contractor" and one or more subcontractors. 48 C.F.R. 9.601. Arguably, the definition does not include the relationship of two subcontractors. An American Bar Association handbook on government contracting speaks of teaming arrangements as "primarily" including agreements "under which the signatories cooperate to pursue a particular contract"; such agreements generally "anticipate the entry into a separate subcontract or joint venture upon the award of a contract." Carl J. Peckinpaugh, Government Contracts for Services 8990 (1997). The Sanders Management Directive and Practice 10.10 says the term teaming agreement includes "jointventure agreements; memoranda of understanding; memoranda of agreement; collaboration agreements; strategic alliances; joint research and development agreements; joint or co-production agreements; licencing agreements; and all other agreements whose objectives are to take advantage of unique and complementary capabilities of Sanders and another organization outside Sanders." In short, "teaming agreement" is not a term narrowly fixed in its meaning but varying with different contexts and arrangements.
 
 
 29
 CCT's first claim in its complaint asserted the existence of a contract "by which Sanders agreed, among other things, to team with CCT to bid for the AP-101F upgrade contract." The existence of such an oral contract was supported by the Woodruff and Hollingsworth depositions. It was not error for the district court to rule that a formal teaming agreement to be submitted to Boeing did not exist because that agreement had to be in writing. It was error to conclude that there was no significant, probative evidence that CCT and Sanders had orally agreed to teaming to bid for the Boeing subcontract. CCT is mistaken in arguing that such a contract is the same as a final teaming agreement. Sanders is mistaken in arguing that CCT's complaint does not permit CCT to recover on this contract.
 
 
 30
 No naked agreement to agree constitutes a contract. Gene Autry v. Republic Productions, 30 Cal.2d 144, 151, 180 P.2d 888 (1947). If CCT can prove no more than that to a jury, Sanders must prevail. But what CCT offered in evidence to the district court was an exchange of promises, supported by consideration, to be a team with Sanders and as a team submit a bid to Boeing. If believed, that evidence established an oral contract. Unlike an agreement to agree, an agreement to use best efforts to achieve a common objective is a closed, discrete, and actionable proposition. Channel Home Centers v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986) (Becker, J.). As might be expected, the law of California is no different from this statement by Judge Becker of what is the law of other American jurisdictions. See Racine & Laranie, Ltd. v. California Dep't of Parks, 11 Cal. App. 4th 1026, 1035, 14 Cal. Rptr. 2d. 335 (Cal. App. 1993).
 
 
 31
 CCT may show that the course of conduct of the parties, both in its earlier arrangements with Lockheed and in its June to October 1996 dealings with Sanders, supports its evidence of an exchange of oral promises in May 1996. The evidence offered by CCT may be disbelieved by a jury, or Sanders may convince the jury that the agreement to team had no content. In that case, Sanders will prevail at trial. What cannot be determined by a court as a matter of law is whether or not CCT and Sanders entered what we note the ABA handbook on government contracts speaks of as customary -an agreement "to cooperate to pursue a separate subcontract or joint venture upon the award of a contract." Peckinpaugh, op. cit., 89-90.
 
 
 32
 Sanders points to two statements of CCT employees that it says are inconsistent with this interpretation of the oral contract, viz. that the contract was not "merely an agreement to submit a proposal" and that the parties "were a team to do the contract," that is, the Boeing subcontract. These statements may indeed be inconsistent with the position that an oral contract to work together was made, but they are not necessarily inconsistent with that position. It cannot be said as a matter of law that these statements disproved or disavowed the oral contract put into contention by the Hollingworth and Woodruff declarations.
 
 
 33
 Sanders amplifies its argument by saying that CCT sued to recover the amount it believed it would have earned if CCT and Sanders had agreed on a bid, submitted it, and won the subcontract. The difference between what CCT would recover on these assumptions and what it would recover if it proved an oral contract to work in good faith to submit a competitive bid is only a difference in the likelihood of success -the likelihood that a good faith effort would have resulted in agreement on a competitive and then winning bid is less than the likelihood that agreement on a competitive bid would have led to the award. The difference does not affect the existence of an oral contract; nor does it defeat CCT's cause of action.
 
 
 34
 CCT overstates its case when it argues that the oral agreement was "the same" as what the final written teaming agreement would have been, and that the latter would have been a mere memorial of the former. Overkill of this kind has not been helpful to its cause and no doubt contributed to the confusion of the district court. On balance, however, we do not think that CCT should be barred from trial on an oral contract of whose existence it furnished evidence, even though it has tried to present this contract as though it were the agreement to be submitted on the bid.
 
 
 35
 The Statute of Frauds, advanced by Sanders as a defense, has no application to this contract, which had to be completed by the November deadline for the bid.
 
 
 36
 CCT is accordingly entitled to a trial on whether it had a valid oral agreement with Sanders to work out a competitive bid to be submitted to Boeing. At trial, of course, the evidence now to be considered, which was not before the district court at the time of the first motion for summary judgment, may be introduced.
 
 
 37
 The Declarations of George E. Woodruff, Kirk Hollingsworth, Michael Starzyk, and David W. Jackson. All of these declarations were obtained before the later summary judgment motions and were before the court when it ruled on those motions. We begin with the declaration of Woodruff made July 3, 1998.
 
 
 38
 Woodruff identified himself as Manager of Business Development for Sanders since March 1, 1993 and as having worked in that capacity with employees of CCT to obtain B1B mission computer upgrade business "for CCT and Sanders." In particular, he declared under oath:
 
 
 39
 8. In May 1996, while working on the RFI Response, Dr. Siddiqui authorized and told me to reconfirm our teaming agreement with CCT manage ment, that required CCT and Sanders to take all steps necessary to compete on and win the B-1B mission computer upgrade contract from Boeing. I personally transmitted that message to Kirk or Clark Hollings worth of CCT, or both of them. Dr. Siddiqui also directed me to:
 
 
 40
 a. tell CCT that Sanders would put our oral team ing agreement in writing as soon as Lockheed Mar tin, internally, resolved a potential conflict of interest arising from multiple Lockheed Martin business units competing for the B-1B mission computer upgrade contract.
 
 
 41
 b. tell CCT that Sanders would provide CCT with STAR processors for the B-1B mission computer upgrade contract; and
 
 
 42
 c. tell CCT that Sanders would provide support engineering services such as radiation hardening and sustaining engineering for the STAR processor.
 
 
 43
 9. In late June 1996, during a meeting in my office, Dr. Siddiqui authorized me to tell CCT that no potential conflict of interest existed that would prevent Sanders from putting the oral teaming agree ment in writing. He also told me to continue moving forward with CCT. I understood that Dr. Siddiqui considered a written teaming agreement as a mere formality. In response to concerns made to me by CCT, Dr. Siddiqui told me at least two times that putting the oral teaming agreement into writing would "get done."
 
 Woodruff further swore:
 
 44
 Dr. Siddiqui seemed to have an unusually close business relationship with Jim Scanlon, the head of Lockheed Martin at Johnson City, NY. On May 22, 1996, immediately after a meeting between Sanders and other affiliates of Lockheed in Nashua, NH con cerning the B-1B mission computer upgrade compe tition, Mr. Ron DeYoe and I approached Dr. Siddiqui and told him that I had failed to secure the Sanders lead position that he had requested me to try to obtain earlier that day. Dr. Siddiqui took Mr. DeYoe and me into his office and called Jim Scan lon. During that conversation, Dr. Siddiqui told Mr. Scanlon: It happened just the way we planned: you're going to lead and we're going to support you. It was clear to both Mr. DeYoe and me what Dr. Sid diqui meant. He wanted to sell STAR processor boards to Johnson City and not to CCT. By conceal ing that information from CCT, it seemed to me that Sanders hoped to enhance Johnson City's chances of winning the B-1B competition with Owego by stringing along CCT until it was impossible for CCT to find a substitute teammate.
 
 
 45
 On October 30, 1996, when Dr. Siddiqui directed Sanders personnel to quit the proposal development efforts at CCT, I objected and told Dr. Siddiqui that his decision was wrong, and probably illegal, because it would prevent CCT from bidding on the B-1B mission computer upgrade contract. I told Dr. Siddiqui that, at a minimum, he should authorize the sale of existing STAR processor boards to CCT - no matter the price -so that CCT could complete its proposal and submit its bid. Dr. Siddiqui, without explanation, refused my request.
 
 
 46
 Woodruff's declaration gave the motivation for his statement: "I prepared this Declaration because I am embarrassed by the conduct of Lockheed Martin, Owego, Johnson City and Sanders, as well as the tactics of their outside lawyers." Woodruff ended his statement with a reckoning of the risk he took in making it: "Lockheed Martin will clearly get rid of me because of this Declaration."
 
 
 47
 In Kirk Hollingsworth's declaration of July 8, 1998, he swore that he was and had been the Vice-President of Marketing for CCT, responsible in that capacity for "pursuing and securing new contracts"; that in May 1996 Woodruff had offered "to have Sanders team with CCT to submit a joint bid for the B-1B program"; that he, Hollingworth, accepted the "invitation"; that it was agreed that CCT would be the lead contractor because, as Woodruff explained, Owego would also be bidding and only one Lockheed entity could have the lead role; that Woodruff promised that Sanders would provide all the STAR processors necessary for CCT to use in the B1B upgrade; that Woodruff promised that Sanders "would formally document the agreement after the CCT team made the bidders' short list"; that, in late June or July, Woodruff told him that Owego regarded the CCT-Sanders team as "a real threat" but that Owego's rivalry would not endanger their relationship; that in reliance on Woodruff's promises, CCT did not seek another supplier; and that, in reliance on those promises, CCT spent $2.1 million "in developing the technical solution with Sanders for the B-1B upgrade."
 
 
 48
 The July 8, 1998 declarations of Starzyk, the CCT project manager, and of David W. Jackson, CCT's chief financial officer, provided evidence that CCT spent approximately $2.1 million "in efforts to cooperate with Sanders " on the B-1B bid.
 
 
 49
 We now review the causes of action as to which all four declarations were available at summary judgment.
 
 
 50
 Promissory Estoppel. As a second string to its contract bow, in case its oral contract theory did not succeed, CCT contended that Sanders had made a promise, or promises, on which CCT reasonably relied, thereby creating a contract under Restatement (Second) of Contracts, S 90 (1981) and California law incorporating this principle. See C & K Engineering Contractors v. Amber Steel Co., Inc., 23 Cal.3d 1, 67, 587 P.2d 1136 (1978). The district court, however, granted Sanders' motion for summary judgment on this claim. The district court reasoned that if parties agree to be bound only by a writing, promissory estoppel cannot effect an end run and create a contract where none was intended. Rennick, 77 F.3d at 316-317.
 
 
 51
 The district court's reasoning was unimpeachable on the basis of its earlier ruling that no contract had been intended. But on this new motion for summary judgment it had new evidence -the Woodruff and Hollingworth declarations -that should have been taken into account as to whether an oral contract had been made. The law of the case as established by the ruling on the first summary judgment motion was not so inflexible as to preclude a second look. See generally Preaseau v. Prudential Ins. Co. of America, 591 F.2d 74, 79-80 (9th Cir. 1979). Moreover, as we have now held, there was sufficient evidence to go to the jury on the contractual intentions of the parties in May 1996. Consequently, it was open to CCT to prove promissory estoppel. The declarations of Starzyk and Jackson provided evidence of detrimental reliance by CCT sufficient to withstand summary judgment. CCT is entitled to go to trial on its claim of promissory estoppel precluding Sanders from denying its obligation to take the steps necessary to submit a team bid to Boeing.
 
 
 52
 Separate promises by Sanders, as to which the Woodruff and Hollingsworth declarations provide enough support to survive summary judgment, are the alleged promises by Sanders to supply the STAR processors and to furnish radiation hardening. The declaration of Starzyk is evidence of CCT's reliance on these assurances.
 
 
 53
 Fraud. Alternative to its claims of contract is a darker scenario advanced by CCT, to wit that Sanders made promises it had no intention of keeping with the purpose of ultimately disabling CCT as a competitor for the Boeing subcontract. Woodruff's July 3, 1998 declaration was prime support for this contention. The district court, however, ruled it insufficiently particular. The district court objected that Woodruff did not identify whether, when he reconfirmed the agreement on behalf of Sanders, he spoke to Kirk or to Clark Hollingsworth. But it was not material whether he spoke to the one or the other. He was the representative of Sanders conveying a message to CCT. The district court, in addition, appears to have inappropriately applied Fed. R. Civ. P. 9(b), requiring particularity in the pleading of fraud, to a summary judgment motion where evidence, not pleading, was to be considered. We have already quoted portions of Woodruff's declaration which, if believed by the jury, would permit the jury to know with sufficient certainty what fraud Sanders had engaged in.
 
 
 54
 To the extent that the district court relied on its first ruling that there was no evidence that Sanders had made promises, the error was double. As we have said, there was evidence of promises, and the Woodruff declaration, now before the court, had to be considered before summary judgment on the fraud claim could be given. This judgment, too, must be reversed.
 
 
 55
 Intentional Interference With Prospective Advantage. Another tort alleged by CCT was that the Lockheed defendants deliberately prevented CCT competing successfully for the award from Boeing. The district court decided this issue on summary judgment on the ground that Sanders had never been contractually bound to CCT, so that pulling Sanders out of its work with CCT was not interference with a contract. As we have held that there was evidence for a contract to cooperate with CCT, the court's ruling was incorrect. CCT has presented evidence requiring a trial on this issue.
 
 
 56
 Breach of Confidentiality. In charging that Sanders had committed this tort, CCT relied in part on an earlier written Non-Disclosure Agreement between CCT and Sanders that ran from June 15, 1993 to June 15, 1996. This agreement does not appear to cover the period when disclosure of CCT's confidential information may have occurred. The district court treated the agreement as the exclusive source of any obligation to maintain confidentiality. In doing so, the court overlooked Kirk Hollingsworth's declaration stating that Woodruff had promised on behalf of Sanders that the information to be furnished on the Boeing bid would be confidential. A triable issue of material fact existed.
 
 
 57
 The district court also ruled that CCT had not and could not establish any damage from disclosure of the information by Sanders, because CCT withdrew from the bidding. But there was evidence that CCT's data were provided by Sanders to Owego, helping Owego to make the winning bid, and that Owego knew of Sanders' relation to CCT. As a remedy for the tort, if it is proved to have occurred, the court may order Owego to disgorge its profit. Gray v. Sutherland, 124 Cal. App. 2d 280, 294, 268 P.2d 754, 761 (Cal. App. 1954); Restatement of Restitution (1937) S 138.
 
 
 58
 Unfair Business Practices. CCT sought relief under California Business and Profession Code SS 17200-208. It is not disputed that damages are not available under the statute.
 
 
 59
 Antitrust Violation. CCT alleged that Owego conspired with other Lockheed companies to violate the Cartwright Act, Cal. Bus. and Prof. Code S 16700-16758. The conspiracy allegedly inflated the price paid by Boeing. Such inflation was no injury to CCT. The district court correctly gave summary judgment against it on this claim.
 
 
 60
 Conclusion. For the reasons stated, the judgment of the district court is AFFIRMED on CCT's eighth and ninth claims, and the judgment of the district court is REVERSED on CCT's first, second, third, fourth, fifth, sixth and seventh claims, and the case REMANDED for trial.
 
 CANBY, Circuit Judge, dissenting in part:
 
 61
 I reluctantly dissent from the majority's decision that CCT has a viable claim for breach of contract, or for other claims related to that claim. I say "reluctantly" because there is evidence, disputed by Sanders, from which a trier of fact could conclude that Sanders did not deal in good faith with CCT. I am convinced, however, that the district court correctly concluded that no contract had been entered between CCT and Sanders.
 
 
 62
 CCT's first claim for relief was for breach of the "teaming agreement." CCT still maintains that this was the single agreement between the parties, which was an agreement to team together and submit a joint bid to Boeing for its contract. There is abundant evidence, however, that the parties intended this teaming agreement to be in writing; indeed Boeing required it to be in writing and submitted with the bid. The parties went through various drafts, negotiating and disputing various terms of this agreement, which was necessarily a complicated document for a twenty-million-dollar joint project. Every draft contained an integration clause and provided that the written agreement was effective upon execution. The teaming contract was never executed, however, because there was disagreement over such fundamentals as who would be lead contractor and what price would be paid for materials supplied.
 
 
 63
 In a letter accompanying a revised second draft of the teaming agreement, the project manager for CCT, having rejected several of Sanders' proposed clauses, said that he wanted a telephone conference "to effect closure on the Teaming Agreement so that each of us can proceed to either continue with our proposal . . . or redirect our efforts towards other business opportunities." In the light of the course of negotiations and such communications as this one, the district court correctly concluded that no jury could find that the parties intended to be bound until a written agreement was reached and executed.
 
 
 64
 The majority opinion apparently concedes this point--that there was no meeting of minds on a teaming agreement that would govern the submission of a joint bid and, if Boeing accepted the bid, the performance of the resulting Boeing contract. The majority concludes, however, that there was an oral agreement to work together in good faith to reach such an agreement, and that there is a triable issue whether Sanders breached that agreement. It was this agreement, according to the majority, that was reflected in the statement of a Sanders executive that "[w]e've got a deal." In my view, California law does not allow for enforcement of such a preliminary agreement.
 
 
 65
 In agreeing to work together to negotiate a written teaming agreement and to submit a bid to Boeing, CCT and Sanders were doing nothing more than agreeing to agree in the future. California restricts the enforcement of such an agreement, however.
 
 
 66
 It is Hornbook law that an agreement to make an agreement is nugatory; and that this is true of mate rial terms of any contract. But the law has progressed to the point that it "does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the par ties if that can be ascertained." [Citation omitted.] . . . But, in the absence of internal or external indicia of what the parties would have agreed upon, the court cannot supply the omitted provision, for that would amount to making a contract for the parties.
 
 
 67
 Roberts v. Adams, 164 Cal. App. 2d 312, 314-315, 330 P.2d 900, 901-02 (1958). Here, there are no objective criteria by which we can determine what the parties would have agreed upon. We cannot decide which party would be lead in the teaming arrangement, nor can we decide what price the parties should receive for items supplied. "The court may not imply what the parties will agree upon." Autry v. Republic Productions, Inc., 30 Cal. 2d 144, 152, 180 P.2d 888, 893 (1947).
 
 
 68
 The majority might respond that there is no need to decide those questions; the only issue is whether the parties bargained in good faith--that is, whether they performed in good faith their initial agreement to work together to craft a proposal. But there is no way to measure the good faith of a party that is insisting on its own proposal, or rejecting the other party's proposal, when there are no bounds to the ultimate agreement that they are supposedly trying to reach. Even if we had a written, executed agreement to work together to reach a teaming agreement and submit an agreed-upon bid to Boeing, the written agreement would be unenforceable because of the indefiniteness of its terms. Thus a written, fully executed joint venture agreement is unenforceable when the most essential part of the venture is yet to be determined. See Pacific Hills Corp. v. Duggan, 199 Cal. App. 2d 806, 812, 19 Cal. Rptr. 291, 295 (1962).
 
 
 69
 It is true that contracts may sometimes be enforceable when they leave a matter to be determined in the future, but "it is a question of degree and may be settled by determining whether the indefinite promise is so essential to the bargain that inability to enforce that promise strictly according to its terms would make unfair the enforcement of the remainder of the agreement." City of Los Angeles v. Superior Court, 51 Cal. 2d 423, 433, 333 P.2d 745, 750 (1959). Here, the matter to be left for future determination is the entire teaming enterprise--the sole goal of the initial agreement to work together. Surely that is far too central to permit enforcement of any preliminary agreement to work together for a future agreement. See, e.g., Alaimo v. Tsunoda, 215 Cal. App. 2d 94, 99, 29 Cal. Rptr. 806, 808-09 (1963) (option to purchase real estate with price to be determined later by seller unenforceable); Roberts v. Adams, 164 Cal. App. 2d at 315, 330 P.2d at 902 (1958) (option to purchase real estate at specified price "payable as mutually agreed by both parties" unenforceable because of uncertainty of terms of payment). I conclude, therefore, that even we view as a separate contract the initial agreement to work together to create a teaming agreement and a joint bid, it is too indefinite to be enforceable.
 
 
 70
 Because I conclude that the parties merely agreed to agree in the future, and that no contract resulted, I would affirm the district court's dismissal of the promissory estoppel claim as well. As the majority opinion concedes, the district court's ruling was correct if there was never any intention to enter a binding contract; promissory estoppel cannot create a contract where none exists. See Rennick v. Option Care, Inc., 77 F.3d 309, 316-17 (9th Cir. 1996).
 
 
 71
 The tort claim of intentional interference with prospective economic advantage also fails. The absence of a contract between CCT and Sanders means that there could be no interference with that relationship. As for the prospective relationship between CCT and Boeing, the district court correctly concluded that there was no evidence that CCT would have been awarded the contract on its own. Its relationship with Boeing was thus defeated by the failure of Sanders to agree with CCT, a failure that violated no duty owed by Sanders.
 
 
 72
 The fraud claim also depends in considerable degree upon the existence of a promise upon which CCT had the right to rely, and the agreement to agree was too indefinite to constitute such a promise. With regard to false representations, I agree with the district court that there was insufficient admissible evidence of such representations to forestall summary judgment in favor of Sanders.
 
 
 73
 I also agree with the district court that there was insufficient evidence to support a claim that Sanders had misappropriated confidential information. It is still not clear to me, as it was not to the district court, just what information was taken, whether it was proprietary or confidential, and what use was made of it. The district court did not err in granting summary judgment to Sanders on this claim.
 
 
 74
 Finally, I agree with the majority that CCT's statutory claims for antitrust violations under the Cartwright Act and for unfair business practices were properly dismissed, for reasons stated in the majority opinion. In the light of my conclusions on all of the claims, therefore, I would affirm the judgment of the district court in all respects.