CITY SOLUTIONS, INC., Plaintiff,

v.

CLEAR CHANNEL COMMUNICA-
TIONS, INC., Eller Media Compa-
ny and Adshel, Inc., Defendants.

No. C 99–00060 WHA.

United States District Court,
N.D. California.

Nov. 21, 2001.

Order denying reconsideration,
Jan. 11, 2002.

Nelson E. Brestoff, Joel S. Moskowitz, Moskowitz Brestoff Winston & Blinderman, Los Angeles, CA, for plaintiff.

Michael B. Green, Brobeck Phleger & Harrison LLP, San Francisco, CA, Richard S. Odom, Brobeck Phleger & Harrison, Los Angeles, CA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S REQUEST FOR SANCTIONS

ALSUP, District Judge.

### INTRODUCTION

Now before the Court in this contract dispute is defendants' motion for summary

judgment on plaintiff's third and fifth causes of action. Plaintiff, along with its opposition, has requested that the defendants be sanctioned for filing a repetitive motion. This order **GRANTS** defendant's motion and **DENIES** plaintiff's motion.

## STATEMENT

This case involves an alleged agreement or agreements concerning a bid on modular newsracks in San Francisco. Both plaintiff and defendants have already moved once for summary judgment; both motions were denied. Defendants have filed another motion, claiming it is justified by new evidence and new legal arguments. In their second motion, defendants ask for summary judgment on plaintiff's third cause of action, in which plaintiff CSI now alleges that defendant Eller Media breached two distinct oral joint venture agreements relating to the bid; and plaintiff's fifth cause of action, which alleges that defendants Adshel and Clear Channel Communications interfered with these agreements. The relevant facts, set forth in much greater detail in the parties' two sets of motions, follow.

On March 12, 1998, the City and County of San Francisco issued a Request for Proposals for a "Comprehensive Pedestal-Mounted News Rack Program for the City and County of San Francisco." The RFP sought a vendor to furnish, install and maintain up to 1,000 new multi-publication modular newsracks under a 20-year contract with the City, at no charge to the City, in return for the vendor receiving the right to sell advertising on the backs of a portion of the newsracks, and/or through free-standing · advertisements. Proposals were to be submitted in writing.

CSI is a company that designs, constructs, installs and operates modular newsracks. Eller is a leading outdoor-advertisement firm. On March 31, 1998, CSI and Eller executives held the first of

what would become several meetings concerning San Francisco's RFP. The parties agree that these meetings were held. They disagree, however, as to what, if anything, was agreed upon at these meetings. The parties also acknowledge that other related contacts were made between Eller and CSI executives, employees and attorneys. But they disagree as to what significance these other contacts had.

Most importantly for the present motion, CSI contends that at a meeting held on April 13, 1998, its President, Tom Trento, and Executive Vice President, David Hughes, agreed with William Hooper, President of Eller's Northern California Region, and George Broder, Eller's Public Affairs Manager, that CSI and Eller would work together on a response to the RFP. CSI also asserts that at a meeting held on May 26, 1998, the parties reached another oral agreement concerning the parties' business relationship should they be awarded the newsrack contract. Defendants contend that any deal to submit a bid together was always contingent on agreement on the terms of CSI and Eller's business relationship. Defendants argue that those terms were never agreed upon (in the May 26 meeting or otherwise), and therefore there was never any actionable agreement at all, only failed negotiations.

In any event, when the deadline for RFP responses eventually came in June 1998, Eller did not wind up bidding with CSI. Rather, Eller was part of the bid submitted by defendant Adshel. Adshel had been acquired by Eller's parent company, defendant Clear Channel, not long before the responses' due date. Ultimately, San Francisco awarded the bid to Adshel, which CSI alleges had no previous experience in building or operating newsracks. CSI then filed this suit in state court against Eller, Adshel and Clear Channel, alleging causes of action for

breach of fiduciary duty; breach of a written confidentiality agreement; breach of an oral joint venture agreement; fraud and deceit; interference with contract; common law unfair competition; and violation of the trade secrets act. Defendants have since removed the suit to federal court, on the basis of diversity. Plaintiff then amended its complaint, as will be discussed in detail below.

## ANALYSIS

■ Two threshold matters must be addressed at the outset. *First*, this is defendants' second motion for summary judgment. Judge Charles Legge, to whom this case was originally assigned, denied defendants' earlier motion (which sought summary judgment on all of plaintiff's claims) as well as plaintiff's own motion for summary judgment in January 2001.[1] Plaintiff protests that defendants' current motion is duplicative of their first. Close review of the arguments made by defendants, then and now, reveals otherwise. Defendants are relying on new evidence and making substantially different arguments than they had back in January in their cross-motion. Their motion is timely and does not disrupt the schedule set for this case. Under the circumstances, it will be considered and no sanctions will be imposed on defendants for filing it. *See Cable & Computer Technology Inc. v. Lockheed Sanders, Inc.*, 214 F.3d 1030, 1038 (9th Cir. 2000).

■ *Second,* both plaintiff and defendants have made several evidentiary objections. Only two of these objections need be discussed; the other evidence is not relevant to this order. Defendants' objection to plaintiff's use of the deposition testimony of Gina Gregori and James McCargo, two contractors interviewed jointly by

CSI and Eller executives, is overruled to the extent that this testimony relates to the parties' behavior (and not to the truth of any "joint venture" comments made). Also overruled is plaintiff's objection to defendants' request that the Court take judicial notice of the declaration of Brett Schuman and the exhibits attached thereto. Defendants' proffer does not keep with the spirit of this Court's standing order, under which reply declarations are disfavored. But these materials were originally filed months ago in connection with the first volley of summary-judgment motions in this case. And many of the documents therein were specifically cited in defendants' proposed statement of undisputed facts (never agreed upon), filed along with defendants' initial brief in this round of summary judgment. In short, plaintiff cannot claim that it was unfairly surprised by defendants' request.

### 1. Summary Judgment.

### (a) General Standards.

Turning to the merits, defendants have moved for summary judgment on plaintiff's third and fifth causes of action. A party moving for summary judgment has an initial burden of production. To carry this burden, it must either produce evidence negating an essential element of the nonmoving party's claim or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party carries its burden of production, the nonmoving party must produce enough evidence to create a genuine issue of material fact. If the nonmoving party does not do so, the moving party wins. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th

---

**1.** Judge Legge ruled on the record and did not issue a written order denying both motions.

Cir.2000). A mere scintilla of evidence is not enough to defeat a properly supported motion for summary judgment. The nonmoving party must introduce some significant probative evidence tending to support their complaint. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Finally, where material facts are not in dispute, whether a contract exists is properly decided on summary judgment. *Ransom v. United States*, 900 F.2d 242, 244 (Fed.Cir.1990).

In their motion for partial summary judgment, defendants contend that Eller and CSI never reached an independent agreement to collaborate on a bid. They posit that any understanding that the parties would bid together was contingent on agreement as to the terms of Eller and CSI's business relationship. Since, they argue, these terms were never agreed upon, the parties never agreed to bid together. Plaintiff disagrees, asserting that the April 13 agreement to bid together was distinct and severable from any agreement as to the parties' long-term working relationship.

**(b) Pleading History.**

These arguments must be evaluated in light of a fundamental shift in plaintiff's position regarding whether one agreement or two agreements were ever reached between it and Eller. Plaintiff filed its original complaint in state court in December 1998. That complaint was verified under oath by Tom Trento, CSI's president. Paragraphs Thirty, 55 and 87 of that complaint swear that defendant breached an oral joint-venture agreement, finalized at the Eller–CSI meeting held on May 26, 1998. The first two paragraphs read as follows (emphasis added):

30. On April 13, 1998, Trento and Hughes met Hooper and Broder in San Francisco, and showed them the existing CSI information centers.... Subsequently, Broder left and Trento

and Hughes continued the discussions with Hooper. At that point, Hooper said that Eller was going forward with CSI and that the parties had a deal *subject only to working out the details.*

55. On Monday, May 26, 1998, Trento, Hughes, Hooper and Broder met at Eller's office in Oakland.... [Hooper] said that the best thing for the parties to do under the circumstances was to discuss the business relationship in detail, covering all the points of contention, put them to bed once and for all, and express them in a written contract to be prepared after the bid had been won. Trento and Hughes discussed with Hooper and Broder the three points which Broder had raised in his call to Trento on May 21, 1998, and reached complete agreement on them. Trento and Hughes, Hooper and Broder then reached an oral agreement to go forward immediately on the joint effort to prepare and submit the RFP bid. Everyone shook hands, and Hooper declared that CSI and Eller had a deal.

Paragraph 87 is part of CSI's fourth cause of action, "Breach of Oral Joint Venture Agreement":

87. Eller entered into an oral joint venture with CSI to bid for the San Francisco RFP, the agreement for which was finalized in the meeting between the parties on May 26, 1998 where the authorized representatives of CSI and Eller shook hands.

This is the only joint-venture agreement the original verified complaint swore that Eller and CSI ever reached.

After the original verified complaint was filed and the case removed to federal court, the Ninth Circuit decided *Cable & Computer Technology Inc. CCT* held that on the facts before it, a defense subcon-

tractor could maintain an action against another defense subcontractor for the alleged breach of an oral agreement to "be a team" and as a team submit a bid to a contractor. *Id.* at 1035. *CCT* held that under the circumstances, the agreement was not an unenforceable "agreement to agree," but rather an "agreement to use best efforts to achieve a common objective," which it characterized as a "closed, discrete and actionable proposition." *Ibid.*

As will be explained, *CCT* is distinguishable from the present case. In any event, two days after *CCT* was decided, plaintiff filed an amended complaint. This amended complaint was well-calibrated to capitalize on *CCT*, and in the process avoid some of the obvious legal perils (such as the statute of frauds) involved with their prior, sworn assertion. The amended complaint recharacterized what Hooper allegedly said at the April 13 meeting. It eliminated the important "subject to" proviso, and instead more vaguely alleged that at the meeting Hooper "indicated that the details of their (CSI and Eller's) business relationship would have to be worked out" (Amd.Compl.¶ 24). More fundamentally, instead of alleging that the parties only reached one agreement, the amended complaint asserted that two distinct agreements somehow existed. Its third cause of action, entitled "Breach of Oral Joint Venture *Agreements*" (emphasis added), reads as follows (Amd.Compl.¶ 76–78):

76. There were two distinct oral joint venture agreements made by the parties. On April 13, 1998, Eller entered into an oral joint venture with CSI to bid for the San Francisco RFP, and subsequently engaged in conduct consistent with, and in furtherance of, that agreement. On May 26, 1998, CSI and Eller orally finalized the agreement for their business relationship if their RFP response was select-

ed by the City, shook hands on their deal, understood that CSI's attorney's (sic) would prepare a revision of a "terms sheet" to reflect their understanding, and further agreed to delay the written documentation of their post-competition deal until after the City had selected their proposal.

77. Eller breached the oral joint venture agreement to respond to the City's RFP by first purporting to terminate the relationship, and then turning on and competing against CSI by forming a different joint venture with its new corporate sister, Adshel. Eller's fiduciary obligations to CSI with respect to their object of their joint venture did not end with Eller's purported termination. While the CSI/Eller joint venture was forced into dissolution as a result of Eller's purported termination, the fiduciary obligations by the parties to each other continued. Eller breached the oral agreement for their post-competition business relationship in the same way.

78. As a proximate result of Eller's breach of the oral joint venture agreement, CSI has suffered economic damages in a sum presently understood to be approximately $16 million.[2]

Plaintiff is now pursuing the "two agreement" theory set forth in its amended complaint. In fact, plaintiff only seeks to enforce one agreement, that allegedly reached on April 13; at hearing plaintiff expressly disavowed any intent to enforce the alleged May 26 agreement.

**(c) Second Agreement: Failure to Agree on Terms.**

■ Defendants assert that plaintiff's original verified complaint, with its sworn assertion that only one agreement ever existed, is closer to the truth. They argue,

---

2. This paragraph ("agreement") has been excerpted correctly.

however, that even the original verified complaint misstates the events of spring 1998 because, *inter alia,* plaintiff and Eller never agreed what their working relationship together would be (on May 26 or otherwise) and, although they always intended to be bound only by a written contract as to those terms, they never signed such a document. In other words, if the original verified complaint's version of the April 13 meeting is accepted, and the "details" referred to in that complaint were never worked out (nor any written agreement signed), no agreement was ever formed as to anything.

■ It is a fundamental principle of California contracts law that no contract is formed where essential elements are reserved for future agreement. *Ablett v. Clauson,* 43 Cal.2d 280, 284, 272 P.2d 753 (1954); *Louis Lesser Enterprises, Ltd. v. Roeder,* 209 Cal.App.2d 401, 408, 25 Cal. Rptr. 917 (1962). Here, important aspects of the parties' business relationship were still up in the air even after the May 26 meeting. To take one of several examples in the record, the parties had not agreed on what constituted cause upon which the parties could terminate the relationship (Antion Dep. Exh. 37 at 7). It is also undisputed that on May 28, 2001, Broder called Hughes and raised concerns about who would own the newsracks. In discovery, plaintiff posited two completely different understandings as to this ownership issue (Schuman Decl. Exh. J, Resp. 9; Antion Dep. Exh. 37 at 2). Finally, the evidence clearly shows that the parties intended that the terms of their business relationship would be set forth in writing, and that no such document was ever signed by the parties (Antion Exh. 37 at 8). *See Rennick v. O.P.T.I.O.N. Care, Inc.,* 77 F.3d 309, 315 (9th Cir.1996).

■ Plaintiff has failed to rebut this showing in any way. Its opposition, in fact, never mentions the May 26 agreement. Although this Court had no duty to rummage through the record to find an issue of material fact that would salvage plaintiff's claim, *see Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996), even its own *sua sponte* review of the parties' submissions has failed to turn up evidence that would create such an issue.

**(d) Severability.**

■ Plaintiff's third and fifth causes of action, then, must rise or fall on its argument that the alleged April 13 agreement to bid together was somehow an actionable agreement, distinct and severable from the terms of the parties' working relationship. After careful review of the record, this order concludes that defendants have shown that the alleged agreement was not so distinguishable, and plaintiff has not produced evidence that would allow a reasonable jury to decide otherwise.

■■ In certain contexts, contractors may reach an actionable agreement to be a team and to submit a bid together as a team. *See CCT,* 214 F.3d at 1032, 1035. *CCT* and the cases it relied upon emphasized that the general rules governing contract formation apply to these agreements; there is no freestanding duty to negotiate in good faith absent an agreement to do so that meets the standards necessary for a legally binding obligation. *Id.* at 1035. Under these general rules, the parties must intend to be bound by the agreement, and (as mentioned earlier) terms regarded as material *to the teaming agreement* cannot be left outstanding from that agreement. *See Channel Home Centers v. Grossman,* 795 F.2d 291, 299 (3d Cir.1986); *Ablett,* 43 Cal.2d at 280, 272 P.2d 753; *Racine & Laramie v. Dep't of Parks,* 11 Cal.App.4th 1026, 1033, n. 4, 14 Cal. Rptr.2d 335 (1992).

The evidence here unmistakably shows that plaintiff and Eller never reached a

"closed" and "discrete" agreement to bid together on April 13. *CCT*, 214 F.3d at 1035. Instead, it shows that any such agreement was always subject to agreement upon the parties' eventual business relationship, making it nothing more than an unenforceable "agreement to agree." *First*, plaintiff's original verified complaint swore that Hooper made any agreement to bid contingent on the parties "working out the details" (OVC ¶ 30). *Second*, the record includes several internal CSI memos from early-to-mid May 1998 in which Trento expressed great concern that the "Eller Deal" had not yet been signed, suggesting that he did not regard the parties as having any legally binding obligations as of that point and that only one "deal" or agreement was ever contemplated (Trento Exh. 258, 259). *Third*, between the April 13 meeting and the deadline for submitting an RFP response, plaintiff's *own lawyer* drafted and provided a "Summary of Proposed Terms." The document (never signed by the parties) provided, in pertinent part, that *"[t]his summary is not intended to create or constitute a legally binding obligation of the parties. It is intended that the parties' legally binding obligations will be set forth in a mutually satisfactory definitive agreement to be negotiated"* (Antion Exh. 37 at 8), This provision, and particularly its use of the word "create," is simply irreconcilable with a mutual understanding that the parties were already legally obligated to one another. This evidence is dispositive. No reasonable jury could conclude that a firm teaming agreement had been reached within the meaning of *CCT*.

Plaintiff's attempt to grapple with other considerations in this case has also demonstrated the infirmity and slipperiness of its argument. In its brief and at oral argument, plaintiff backtracked from its amended complaint's characterization of the alleged April 13 agreement as just one to bid together as a team. Instead, at these junctures plaintiff said that it and Eller not only reached an agreement to bid on April 13, but also agreed on the "basic terms" of their relationship. These "basic terms" included a fifty-fifty partnership under any contract that might be awarded (Opp.6).[3] As far as proving up damages goes, this is a convenient version of the alleged April 13 agreement, insofar as plaintiff would otherwise face a near-insuperable obstacle in proving, with the specificity required under California law, the damages arising out of a breached agreement to bid (without any understanding as to what the terms of the bid, or of the parties' relationship with one another, would be). *See* Cal. Civ.Code § 3301; *Vestar Development II, LLC v. General Dynamics Corp.*, 249 F.3d 958, 961 (9th Cir. 2001).[4] But it also goes to prove that the April 13 meeting did not produce what the parties understood as a freestanding agreement to bid, independent of all terms of the business relationship. Rather, it provides further evidence that up until the amended complaint, the parties understood the two issues as interrelated, and that agreement on the terms of the parties'

---

**3.** This order expresses no opinion as to whether this view of the alleged agreement to bid would subject it to the statute of frauds. (Were the agreement only one to submit a bid, with no understanding as to the parties' relationship under a 20–year contract, it would not fall under the statute. *CCT*, 214 F.3d at 1036.) Nor does it voice an opinion as to the relationship of this interpretation with defendants' alternative argument that the Court cannot enforce a scheme to evade

San Francisco's Domestic Partners Ordinance.

**4.** For the purposes of any appeal, the court of appeals is respectfully directed toward oral argument on November 15, 2001, in which the issue of proving up damages was discussed. Although plaintiff's claim implicates *Vestar*, that decision was not explicitly discussed at hearing.

business relationship was always a prerequisite to any agreement to bid together.

To stave off summary judgment, plaintiff points to evidence that it claims proves that an actionable agreement was reached at the April 13 meeting. This evidence consists of deposition testimony and actions taken by Eller and CSI employees between April 13 and May 26. Plaintiff has skillfully excerpted the deposition testimony in its briefs. More complete review of the record, however, shows that this evidence is not meaningfully probative of plaintiff's position. Plaintiff places particular emphasis on William Hooper's deposition testimony. A representative (and more complete) excerpt of a particularly pertinent provision (with overruled objections and irrelevant sections omitted) follows (Hooper Dep. 138–140):

Q: Do you believe that there was any kind of oral understanding to go forward on a joint response to the City's RFP at the conclusion of your meeting on April 13, 1998?

A: I think we concluded we should proceed to try to develop a relationship.

Q: Did you have an understanding on April 13 that a response involving City Solutions and Eller was going to be made before the deadline was up, whatever that deadline was, at the conclusion of your meeting on April 13?

A: I believe we agreed to help them with their proposal.

\* \* \* \* \* \*

Q: Were you going to be a part of the City Solutions team?

\* \* \* \* \* \*

A: Yeah, I don't know what had been decided at that point, but at some point we decided to be in the proposal and designated as the company that would handle the advertising.

Q: So you were going to be a participant in that way in the City Solutions

response that was going to be turned in before the deadline, whatever it was, at that point in time, is that a fair statement?

\* \* \* \* \* \*

A: There was—we were going to participate in some way, but I'm not exactly sure at that time specifically which way we were going to participate.

\* \* \* \* \* \*

Q: How would you characterize the way in which Eller was going to be a participant in the response that City Solutions was going to submit?

\* \* \* \* \* \*

A: I think the take on the meeting was to come back with ideas of how we would have a relationship.

■ This testimony, as well as the rest of Hooper's deposition, simply does not support plaintiff's claim that on April 13, 1998, it and Eller reached a closed and discrete agreement to work together on a bid. Plaintiff's other evidence also falls short. Much of it sidesteps the crucial issue of the parties' intent to hold off on any agreement to bid together until they agreed on their business relationship. Testimony from Gina Gregori and James McCargo (contractors interviewed by Eller and CSI executives), and documents relayed between and within Eller and CSI are no more suggestive of a partnership than of due diligence occurring in the context of ongoing negotiations. Therefore, it does nothing to counter defendants' showing that plaintiff and Eller conditioned any agreement to bid together on settling other terms. Deposition testimony from George Broder excerpted in plaintiff's brief actually works in defendants' favor, showing the interrelationship between any agreement to bid and the terms of the business relationship (Broder Dep. 73) (emphasis added):

Q: Wasn't Eller working with City Solutions to prepare a joint response to the RFP?

A: We were working *towards* a submission with City Solutions in some manner, shape or form, as to the business relationship, still not determined and resolved.

On this record, summary judgment is appropriate. *See, e.g., British Airways Bd. v. Boeing,* 585 F.2d 946, 951 (9th Cir.1978) (immaterial disputes and a scintilla of contrary evidence cannot preclude a well-supported motion for summary judgment). The record does not raise a genuine issue of material fact even as to whether the parties' actions satisfied California's liberal standards for the formation of a joint venture. *Boyd v. Bevilacqua,* 247 Cal.App.2d 272, 287, 55 Cal.Rptr. 610 (1966).[5] Rather, it places this case close to *Rennick v. O.P.T.I.O.N. Care, Inc.,* 77 F.3d 309 (9th Cir.1996). There, the plaintiffs alleged that they and the defendant entered into an oral agreement to work together, memorialized by a handshake. After that meeting, the parties both signed a letter of intent in which the defendant had inserted language clarifying that the earlier meeting was only "directed toward" an agreement. *Id.* at 312. In affirming the district court's grant of summary judgment

to the defendants, *Rennick* held that the letter of intent showed that the parties understood that they did not yet have a contract. *Id.* at 314. Here, the evidence that no agreement was ever reached on April 13 is even more powerful. Among other things, plaintiff's attorney, not defendants', authored a document providing that well after April 13, the parties believed themselves to have no legally binding obligations to one another.

Meanwhile, this case is differentiable from *CCT,* a decision much relied on by plaintiff. *CCT* reversed a district court's grant of summary judgment for defendant Lockheed Sanders. Plaintiff CCT had argued that it and Lockheed Sanders had reached an oral agreement to bid together on a federal military defense contract. It was undisputed that both parties expected they would ultimately sign a written "teaming agreement"; that no written teaming agreement was ever signed; and that the parties had never agreed on what CCT would pay Lockheed Sanders for the products and services it would provide if they were awarded the contract. But one fact of great importance was different. It was also undisputed there that at the conclusion of a meeting between the parties concerning the bid, a Lockheed Sanders executive said "We've got a deal" to his CCT counterpart.[6] Here, the roughly

---

**5.** Plaintiff emphasizes this liberal standard, but it is nonetheless clear under California law that the parties must agree to act as joint venturers. *Boyd,* 247 Cal.App.2d at 287, 55 Cal.Rptr. 610. Here, plaintiff has asserted that two joint-venture agreements were made as of dates certain—April 13 and May 26, 1998. As pled, the subsequent conduct with contractors and as between plaintiff and Eller can only be evidence of whether a prior agreement was reached. It is not a substitute for such an agreement. *See Universal Sales Corp. v. California Press Mfg. Co.,* 20 Cal.2d 751, 764–65, 128 P.2d 665 (1942) ("Whether the parties *to a particular contract* have thereby created, as between themselves, the strict

relation of joint adventurers or some other relation involving cooperative effort, depends upon their actual intention.")

**6.** Also, after the district court ruled on CCT's contract claim, plaintiff submitted a devastating "smoking gun" declaration. In the declaration, a Lockheed Sanders executive swore that his company had told CCT they were a team, but in fact just strung CCT along (with the intention of abandoning it close to the bid-deadline date) so that another Lockheed division (collaborating with another contractor) would be awarded the bid. The executive swore he submitted his declaration because he was "embarrassed" by his employer's conduct. *Id.* at 1036–37.

equivalent statement is, "We've got a deal, *subject to working out the details.*" A world of difference separates the two. The former created a material issue of fact as to whether the parties reached a "closed" and "discrete" agreement to collaborate on a bid, making the district court's grant of summary judgment erroneous. The latter statement, nowhere rebutted or defused within this record, forecloses, rather than creates, such an issue. It establishes that, on April 13, the parties reached, at most, an unenforceable agreement to agree in the future.

*CCT* also emphasized that the parties before it were federal defense contractors entering into a "teaming agreement." These teaming agreements are defined broadly by federal regulations. *See* 48 C.F.R. § 9.601. As among defense contractors, *CCT* stressed, teaming agreements are not narrowly fixed in their meaning, but instead vary with different contexts and arrangements. *CCT*, 214 F.3d at 1035. In other words, one might expect that defense contractors, operating in a world of close, long-standing relationships, would reach informal agreements to bid together without finalizing the business terms in advance. Here, however, plaintiff and Eller were contemplating entering into their first business relationship together, one which would last for 20 years. No similar regime of informal "teaming agreements" recognized by federal regulations existed. One would anticipate more, rather than less, formality given these facts.

## CONCLUSION

The record shows unmistakeably that up until plaintiff filed its amended complaint, neither it nor Eller ever believed that a distinct agreement to bid together was formed on April 13, 1998. No material issue of fact exists on this point and no reasonable jury could find otherwise. As to any single agreement, the undisputed facts show that the parties failed to agree on material terms before negotiations were abandoned. And since no contract was ever formed between plaintiff and Eller, neither Adshel nor Clear Channel could have interfered with that contract. For these reasons, defendant's motion for summary judgment on plaintiff's third and fifth causes of action is **GRANTED**. Plaintiff's request for sanctions under FRCP 56(g) is **DENIED**.

In light of this ruling, the Court will allow defendants to file a motion for partial summary judgment as to plaintiff's breach of fiduciary duty claim (and only that claim) on or before January 24, 2002, for hearing on February 28, 2002, at 8:00 a.m.

**IT IS SO ORDERED.**

## ORDER: (1) DENYING MOTION FOR RECONSIDERATION; (2) DENYING MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL; (3) DENYING LEAVE TO AMEND; AND (4) VACATING HEARING

Plaintiff City Solutions, Inc., has moved for reconsideration of the partial summary judgment dated November 21, 2001. In the alternative, plaintiff requests certification of an interlocutory appeal. Plaintiff has also moved for leave to file a second amended complaint. For the reasons stated herein, this order **DENIES** all motions. The hearing scheduled for January 17, 2002, is **VACATED**.

The parties are familiar with the facts and procedural history of this case. As all are aware, an order issued November 21, 2001, granted defendants' motion for partial summary judgment as to plaintiff's third (Breach of Oral Joint Venture Agreements) and fifth (Interference with Contract) causes of action. The order granting partial summary judgment concluded defendant Eller Media Company and

plaintiff reached only an "agreement to agree" and that no reasonable jury could reach a contrary decision from the record.

In its motion for reconsideration, plaintiff contends that the November order erred. Plaintiff primarily focuses on two items. Both implicate plaintiff's original verified complaint. The November order noted that this complaint, verified under oath by plaintiff's president, was fundamentally inconsistent with plaintiff's argument that a discrete joint-venture agreement to bid together had been reached on April 13, 1998. Paragraph 30 of the verified complaint stated under oath that at the crucial April 13 meeting, Eller's chief negotiator said "the parties had a deal *subject only to working out the details*" (emphasis added). The devil, of course, is in the details. The italicized proviso precluded any enforceable agreement until the details were, in fact, "worked out," if ever. Meanwhile, Paragraph 87 of the complaint, part of plaintiff's "Breach of Oral Joint Venture Agreement" (singular) cause of action, provided that "Eller entered into an oral joint venture with CSI to bid for the San Francisco RFP, the agreement for which was finalized in the meeting between the parties on May 26, 1998 where the authorized representatives of CSI and Eller shook hands." The import of these paragraphs is that only one joint-venture agreement was alleged to exist. The order then noted that the record showed that the "details" referenced in Paragraph 30 were in fact significant and had never been worked out, on May 26 or otherwise.

Plaintiff asserts that the verified complaint, read as a whole, *did* say that a discrete joint-venture agreement was reached on April 13, 1998. Specifically, plaintiff points to the complaint's Paragraph Two. That paragraph provided as follows:

Initially, CSI and Eller entered into a written Confidentiality Agreement. Pursuant to this Confidentiality Agreement, CSI shared confidential information with Eller about CSI's business and expertise. Representatives of Plaintiff and Eller then shook hands on the oral agreement to make a joint venture bid for the newsrack contract in San Francisco in May, 1998. They also commenced work on a "terms sheet" to describe their relationship if they succeeded in the competition and won the contract. With only approximately two weeks until the due date for the bid, the parties agreed on the terms of their post-competition relationship, an agreement which was partially reflected by a "terms sheet" and partially by an oral agreement. Because the parties agreed to focus on completing their bid, one of the terms of the oral agreement was that the documentation of the post-competition agreement would be postponed until after the competition was over.

This paragraph, in the introductory section of the complaint, plainly stated that the oral agreement was reached in May 1998, not in April 1998.[1] To learn about any April 13 "agreement," one must go to Paragraph 30, where it was sworn to that the "agreement" was, in fact, made "subject to working out the details"—and thus was not an agreement at all. Although plaintiff now tries to characterize Paragraph 30 as discussing two discrete agreements, one to bid and one going to the parties' potential business relationship, this is belied by Paragraph 87, which stated that the oral joint venture "to bid" was only finalized on May 26, 1998.

---

1. It could not refer to when the bid would be submitted; as of April 13, the deadline for bid submissions was April 27, 1998.

Next, plaintiff argues that the "subject to working out the details" language in the original verified complaint is somehow negated by defendants' verified answer. In that answer, defendants expressly denied the allegations contained in the final sentence of Paragraph 30 of the verified complaint. That sentence provided in full, "At that point, Hooper said that Eller was going forward with CSI and that the parties had a deal subject only to working out the details." Plaintiff contends that by denying the entire sentence, defendants "knocked out" what it characterizes as the only clear-cut evidence in the record that Eller considered any agreement to bid together to be contingent on future agreement on business terms. Not so. Plaintiff made the statement under oath. It had and has the same force as a declaration. It shows that even plaintiff conceded no firm deal existed as of April 13. To be sure, the answer denied the sentence in question. But it is ridiculous to treat the denial as consistent with an even stronger allegation, *i.e.*, as consistent with a new and more robust claim that a full and final agreement was reached on April 13. Plaintiff framed the sentence. Defendants were free to deny all of it if defendants disagreed with any material element therein. The denial cannot possibly be read to concede that any plan or accommodation or *modus vivendi* reached on April 13 was unconditional and not subject to working out the details.

Plaintiff has simply not shown good cause to relieve it from the sworn statements made herein. A party cannot conveniently change its sworn story as the case progresses to fit the ebb and flow of appellate caselaw. A party with the burden of proof on an issue is bound by its sworn and clear-cut statements thereon unless good cause is shown to excuse a misstatement. That has not been shown here.

The November order also found it strange that plaintiff's new story emerged only days after the issuance of *Cable & Computer Technology Inc. v. Lockheed Sanders, Inc.*, 214 F.3d 1030 (9th Cir. 2000), a decision plaintiff relied on in its summary-judgment opposition brief to support its "two-agreement" argument. The order said the record showed that "up until plaintiff filed its amended complaint, neither it nor Eller believed that a distinct agreement to bid together was formed on April 13, 1998." Plaintiff has now submitted correspondence between the parties showing that the amended complaint was in the works before *CCT* was issued. Even if counsel had no inkling that *CCT* was pending and had no intent to tie into any prospective ruling in *CCT*, the fact is that this Court's order was and remains based on solid facts in the present record. The November order stands.

■■■ Plaintiff also seeks an interlocutory appeal. It frames the issue to be certified as whether *CCT* is distinguishable for the reasons stated in the November order. It is difficult to see how certification would materially advance the ultimate resolution of this case, a prerequisite for any grant of an interlocutory appeal. *See* 28 U.S.C. 1292(b). Trial (on all remaining issues) will begin on Monday, September 16, 2002, at 8:00 a.m. Although trial is several months away, an interlocutory appeal would result in its postponement, on a case already detained too long. Piecemeal appeal is not warranted.

■■■ "In light of the Court's order," plaintiff has also moved for leave to amend its complaint for the second time (Br. at 12). Specifically, it wants to add claims for interference with prospective economic advantage (against Adshel) and breach of confidence (against Eller) to its complaint. Plaintiff also wants to add Adshel as a defendant to its claim for violation of the

**1048**

Trade Secrets Act. This motion is denied. This case was filed three years ago. Plaintiff has already amended its complaint once before. Discovery has closed. Two rounds of summary-judgment motions have been heard. The proposed amendments could have been made long ago. Plaintiff does not have a good excuse for its delay, except for the fact that the Court ruled against it on two claims. It would be unfair and prejudicial to force defendants to respond to a new wave of claims at this point. Furthermore, although plaintiff makes the bare assertion that discovery will not need to be reopened, this is unlikely to be the case.

For the reasons given above, all of plaintiff's motions are **DENIED**. The hearing scheduled for January 17, 2002, is **VACATED**.

**IT IS SO ORDERED.**